POLLOCK  BARBOUR

*v.*

SCOTTISH-AMERICAN  MORTGAGE  COMPANY *et al.*

*Filed at Ottawa November 10, 1881—Rehearing denied March Term, 1882.*

1.  DEED OF TRUST—*release by trustee—rights of subsequent incum-brancer.*  Where a deed of trust given to secure a debt is released by the trustee without authority of the party secured, and he has never sanctioned or ratified the act, a subsequent incumbrancer can not obtain a prior lien.

2.  But if the party secured by the deed of trust authorizes the trustee to release the lien, or if he fails at once to repudiate the act of the trustee in making the release without authority, when informed of the fact, and lies by until third persons have advanced large sums of money upon the faith of what his agent has done, he will be estopped from repudiating the act as unauthorized.

APPEAL from the Appellate Court for the First District;— heard in that court on appeal from the Superior Court of Cook county; the Hon. JOHN A. JAMESON, Judge, presiding.

Mr. WILLIAM H. SISSON, Mr. WESLEY SISSON, and Messrs. MASON & MITCHELL, for the appellant:

1.   The release of the trust deed from Welch to Curry was fraudulent and void, because executed without consideration, and in direct violation of the trust.

2.   At the time of the release by the trustee, the notes secured thereby had been executed only five days, and were not due.   Under such circumstances it was the duty of the mortgage company, before taking their mortgage on the same property, to have learned whether such release was authorized, and not having done so, they can not claim the superior and first lien.   *Keohane* v. *Smith,* 79 Ill. 156; *Anderson* v. *Warne,* 71 id. 20; *Brown* v. *Blydenburg,* 7 N. Y. 141; *Baker* v. *Bliss,* 39 id. 70; *Flower* v. *Elwood,* 66 Ill. 438; *Edgerton* v. *Young,* 43 id. 464.

3. There was no ratification. A delay of intelligence until an election to approve or disapprove, when attended with no benefit to the principal, will defeat the right to construe silence into ratification. Paley on Agency, 172; *Armory* v. *Hamilton,* 17 Mass. 109.

4. Fraud and collusion between the agent and the third person destroy the rule that the knowledge of the agent is to be considered as known to the principal. *Rockford Ins. Co.* v. *Nelson,* 65 Ill. 45.

5. Implied ratification must be based upon full knowledge by the principal of all the facts. *Manufacturers' National Bank* v. *Barnes,* 65 Ill. 69; *Cadwell* v. *Meek,* 17 id. 220; *Farwell* v. *Meyer,* 35 id. 40; *Kerr* v. *Sharp,* 83 id. 199; *Mathews* v. *Hamilton,* 23 id. 470.

6. The facts which the court is authorized to declare conclusive of the intention of a party to ratify unauthorized acts, done in his behalf by another, are such as must be inconsistent with a different intention. *Abbott* v. *May,* 50 Ala. 97; *Horton* v. *Towne,* 6 Leigh, 47; *Crooker* v. *Appleton,* 25 Me. 131.

Mr. THEODORE SHELDON, and Mr. S. W. PACKARD, for the appellees:

1. The execution of the notes and trust deed was only a partial execution of the contract made with Curry at the time of the sale to him. The terms of sale also contemplated the discounting of the notes and the release of the trust deed, to enable Curry to put a building loan on the property.

2. A written instrument, executed in part performance of a previous parol agreement, does not supersede such parol agreement. *Barker* v. *Bradley,* 42 N. Y. 316, and cases there cited; 2 Wharton on Evidence, sec. 1015; 1 Greenleaf on Evidence, sec. 284 a; *Kirkham* v. *Boston,* 67 Ill. 606; *Courtney* v. *Faller,* 65 Me. 158.

3.  The release was executed in pursuance of an agreement, though in parol, which constituted a part of the terms of the sale to Curry.  It is, therefore, competent to show this agreement, for the release was executed in part performance of it.

4.  Mr. Barbour knew of this release shortly after it was executed, and not later than November, 1875, and even if it had been executed without his authority, his subsequent conduct amounted to a ratification.  Story on Agency, secs. 253, 255; 2 Greenleaf on Evidence, sec. 67; *Searing* v. *Butler*, 69 Ill. 575; *Williams* v. *Merritt*, 23 id. 623; *Foster* v. *Rockwell*, 104 Mass. 167.

Mr. CHIEF JUSTICE CRAIG delivered the opinion of the Court:

This was a bill in equity, brought by Pollock Barbour, against Henry I. Sheldon, Daniel N. Hale, and Scottish-American Mortgage Company, to foreclose a deed of trust which was executed June 26, 1875, by Elizabeth W. Curry, and her husband, Llewellyn Curry, to F. G. Welch, trustee, on certain property in Chicago, to secure the payment of four promissory notes, of $2540 each, payable to the order of the complainant, in one, two, three and four years.  The bill prayed that the trust deed be declared a first lien on the premises; that if a release deed has been made by the trustee, it be canceled and held for naught; that complainant be allowed a decree of foreclosure, and such other or different relief as is meet.  All of the defendants joined in an answer to the bill, to which a replication was filed.  On the 12th day of June, 1877, defendant Scottish-American Mortgage Company filed a cross-bill to foreclose two trust deeds, of $2500 each, made by the Currys, July 1, 1875, on two of the lots contained in complainant's deed of trust, claiming that the deed of trust made by the Currys to complainant had been duly released, and the deed of trust

described in the cross-bill was the first lien on the property. An answer and replication having been filed, a hearing was had on the evidence, which resulted in a decree dismissing the original bill, and a decree in favor of complainant in the cross-bill.

It appears from the testimony, that the six lots involved in this litigation originally belonged to the complainant, who resided in the State of Kentucky. The lots were vacant and unimproved. On the 26th day of June, 1875, Elizabeth W. Curry purchased the property from Davidson & Welch, who resided in Chicago, and were agents of the complainant. The price agreed to be paid was $10,160, payable, $2540 in one, two, three and four years. Davidson, who had a power of attorney to sell and convey, executed the deed to Mrs. Curry, and to secure the purchase money, she, on the 26th day of June, executed a deed of trust to F. G. Welch on the property. The deed and trust deed were placed upon record. On the 24th day of July, Welch, the trustee, executed and placed upon record a release of the trust deed which secured the payment of complainant's notes. If the deed of trust was released by Welch without any authority from Barbour, and the act was never sanctioned or ratified by him, it is apparent that the mortgage company could not hold the property as against complainant's deed of trust.

But it is claimed by the mortgage company that the release of the trust deed by Welch was done in pursuance of the terms of sale to Curry, and with Barbour's assent and approval. At the time Curry purchased the property, it was understood and agreed that she should erect a brick building on each one of the lots. It was also expected that she would procure a loan on the property to enable her to erect the buildings, as she had not the means of her own. Curry testified: "The purchase was upon the terms that I was to have the ground—116 feet—for $10,160, on four years' time, at eight per cent, four notes to be given by my wife, for $2540

each, due in one, two, three and four years, secured by trust deed. I was to be allowed a release of the trust deed at once, to enable me to borrow money on the property, and give a first lien to secure the loan, with which to pay said purchase money, and build a brick block, it having been agreed that the four notes should be discounted to me at one and a half per cent per month. The terms of that purchase were not complied with. It was agreed that the purchase price, some $7500 of the notes, should not be exacted in one sum, for I ascertained, and explained to Davidson & Welch, that the mortgage company would only pay it to me in installments,—$5000 down, $5000 when the building was up to the first story, and $5000 when completed. I had contracted the loan of that company, and it was agreed that of the first $5000 Barbour should have about half, the balance to be loaned or advanced to me to carry the building up to the point where I should draw another $5000 installment,— all which was a part, really, of the contract of sale by Barbour. Finally, in pursuance of the agreement recited, the land was deeded by Lyne S. Davidson to my wife, on June 26, 1875, she giving back a trust deed to F. G. Welch, trustee, to secure her four notes. Afterwards, on July 25, 1875, Welch, in pursuance of the agreement, released to my wife. This release being put of record, enabled me to borrow of the mortgage company, which I did on July 29, 1875, on which day that company paid me the first installment."

In regard to the terms of the sale, the evidence of Curry seems to be corroborated by Welch, who testified: "At the time of the sale, Mrs. Curry did not claim to have the money to erect the buildings. It was agreed that she should put a building loan on the property, and out of that money the land should be paid for, she reserving the right to discount the notes at one and a half per cent per month. It was agreed that the trust deed securing the purchase money should be released, in order to enable her to put a first mortgage on

the property for a building loan, and to raise purchase money. She would not have purchased upon any other terms."

If the evidence of Welch is at all reliable, Barbour knew that by the contract under which Mrs. Curry purchased, the deed of trust was to be released. Upon this point he testified : "After Phœnix and Warren failed to come to time, I told Mr. Barbour I had found another purchaser in Mrs. Curry, and I explained to him how Mrs. Curry was to pay : first, discounting the notes at one and a half per cent; second, releasing the trust deed and placing a building loan upon the lots,—and he consented." Phœnix and Warren had previously purchased the property under a written contract, but were not able to comply with the terms of purchase.

From Barbour's own evidence it looks reasonable that the property was to be released from the trust deed. He testified : "This sale of the property was done under a pressing necessity to raise money, and the sale was made, and the parties promised to get a mortgage and raise money, and pay me before these notes matured, and that was the reason the notes were left here, because I expected and hoped that in a short time they would make or consummate this arrangement, and I would come up and get my money, and sign the notes and all the papers that were necessary."

How could Mrs. Curry raise money by mortgage on the property, unless the Barbour deed of trust was released? It was beyond her power to do so, for the reason the amount named in the deed of trust was the full value of the property, and more than its value in cash, as we may conclude from the fact that Barbour was willing, and agreed, to accept $7500 in full for the amount of the deed of trust. There was no way in which money could be raised by Mrs. Curry, unless Barbour's deed of trust was released. Davidson, with whose testimony complainant finds no fault, says Barbour knew the notes were to be discounted, but did not know at what rate. He acquiesced in the agreement, and said it was all right,

in order to get cash. Indeed, the plan which had been adopted to raise money to meet Barbour's pressing demands seemed quite plausible. The contractor had agreed with Curry to erect the six buildings for $7500 in cash and four of the lots, subject to the mortgage of the mortgage company of $2500 on each lot. The mortgage company had agreed to advance $15,000 on the property as the buildings progressed, in installments of $5000 each. Barbour had agreed to discount his notes at one and a half per cent per month, and take a net sum of $7500 in full of his claim. In order to consummate this arrangement, the first thing to be done was to release the Barbour deed of trust, and the arrangement was so plausible that it is not surprising his agents consented to it, and he, too, fell in with the plan. When the situation of all the parties is considered, the probability of the truth of Welch's evidence, in which he says, "I explained to him how Mrs. Curry was to pay: first, discounting the notes one and a half per cent; second, releasing the trust deed and placing a building loan on the lots,—and he consented," is much strengthened.

Doubtless Barbour expected that the transaction would be closed up in such a manner that he would not meet with loss, but at the same time it seems evident from the testimony that his agents were clothed with authority to manage the matter as they deemed best, including authority to release the deed of trust. He testified: "I suppose Davidson knew that I was selling the property to get money to pay a debt here. * * * As to the particular steps they went through in the matter, I just relied on Mr. Davidson to take care of it, as I was absent." Q. "You rather trusted to your agents, and expected them to look after it?" A. "That was the reason these notes were left in their safe, because I expected them soon to be taken up." Q. "You trusted them in their possession, and to arrange the matter so you would be perfectly safe and secure?" A. "I did." Now, if the com-

·plainant trusted the entire arrangement of this matter with his agents, and they erred in judgment, and in consequence he suffered a loss, he, and he alone, must bear the loss. It can not fall upon the mortgage company, who acquired in good faith a lien on the property, acting upon the faith of what had been done by complainant's agents.

But even if Barbour did not authorize Welch to release the deed of trust,—if he subsequently, upon being informed of the act, ratified it,—he will be bound by such ratification, and the release will be regarded as valid as if it had in the first instance been authorized. The fact that Welch was duly and properly appointed a trustee in the deed of trust, is not disputed. By the terms of the deed he was the trustee and agent of Barbour, and if in his capacity as agent he exceeded his authority, Barbour was bound to repudiate such unauthorized act at once. He had no right to lie by in silence, and wait until third parties had advanced large amounts of money upon the faith of what his agent had done, and then undertake to repudiate the act as unauthorized. Honesty and fair dealing required Barbour to act at once upon receiving information of the unauthorized act of his agent. *Searing* v. *Butler*, 69 Ill. 575, and cases there cited.

The release was executed July 25, 1875, and placed upon record. It appears from the evidence that Barbour was in Chicago on the 5th day of November, 1875, stopped at the Grand Pacific Hotel, and remained several days. At this time the work on the buildings was suspended, and had been suspended for some time, and was not resumed until the latter part of November, when the final arrangement was consummated between Davidson & Welch, Curry, and Hall, under which Hall obtained a deed for four of the houses and lots, Barbour two, subject to a mortgage on each for $2500, and Hall agreed to go on and complete the buildings. When Barbour was in Chicago at this time, the work was suspended. Welch testified that he took Barbour out in his

buggy to see the buildings, at which time he thinks he explained fully to him this arrangement, and he says: "My recollection is he assented to it." Barbour, however, denies that he knew of the release and the arrangement mentioned by Welch, until after the buildings were completed, in 1876, but his evidence upon this point is not satisfactory. Upon page 17 of the abstract he says:

"My visits to Chicago were quite seldom,—irregular,—just as I had business to call me. I keep no dates. I generally went first to see Mr. Davidson; think he was stopping at the Palmer House. I never saw the buildings after they were up to the first story, until they were about completed. I was standing in the street looking at the buildings when Welch first told me of the release. There was not a soul working on them, but I think there was a good deal of material round there."

Q. "Did Mr. Welch explain to you why the workmen were not going on with the buildings?"

A. "He told me there was some difficulty about raising means to prosecute the work."

Q. "Did he say anything to you—did he explain to you that the mortgage company had refused to make any more advances?"

A. "At the time the buildings were up to the first story?"

Q. "Yes."

A. "Well, that is what Mr. Davidson and Mr. Welch both told me, that there was some difficulty about that. It was Mr. Davidson that went out with me when I first saw the buildings."

Q. "It was not Mr. Welch?"

A. "When the buildings were up to the first story?"

Q. "Yes."

A. "No, sir."

Q. "You were confused about the time, then?"

A. "Well, I may be mistaken."

This evidence seems to corroborate Welch. On this occasion Barbour admits that he was at the buildings with Welch,—that they were not completed. The work was suspended, and a large quantity of material on the ground. This was doubtless in November,—the time referred to by Welch. It could not have been later than November, 1875, because there was no suspension of the work after the consummation of the final contract in November. After that time the work progressed without intermission until it was completed, about the 1st of May, 1876. Now, if Barbour knew of the release in November, 1875, and took no steps whatever to repudiate the act until the commencement of this suit, in 1877, his silence for so long a time must be regarded as an acquiescence in and ratification of the act of his trustee and agent, Welch.

The decision of the Appellate Court will be affirmed.

*Judgment affirmed.*