CHICAGO AND GREAT WESTERN RAILROAD LAND COMPANY *et al.*

*v.*

WALTER L. PECK *et al.*

*Filed at Ottawa January 22, 1885.*

1. FREEHOLD—*whether involved in suit for enforcement of liens upon real estate—and concerning redemption, etc.* Where the scope of the litigation in divers bills and cross-bills, heard together, is the establishment of liens on real estate, by mortgage or otherwise, and their enforcement, the redemption from such liens and the resistance of such redemption, all on the part of creditors, there being no adverse claims of title arrayed against each other of the various parties, no question of freehold is involved, and a writ of error to review the proceedings is properly sued out of the Appellate Court instead of the Supreme Court. A finding that the party executing a deed of trust on land was at the time the owner thereof, is not a decision as to the freehold, where there is no claim of an adverse title. Such finding amounts to no more than that there was a valid deed of trust made.

2. APPEAL—*as to consolidated causes—whether to be treated as one.* Several original bills in chancery and cross-bills were filed by creditors and lienholders of a defendant company, involving a settlement of various and conflicting claims and liens upon the same property, substantially, were heard together, by consent, and under an agreement of all parties that all the evidence in any one or more of the causes should apply to every other of the suits, so far as applicable, and the evidence was preserved by one common certificate: *Held*, that as the causes were heard and determined as one cause in the trial court, the same might well be reviewed, on appeal or error, in the same manner, as one cause.

3. LIMITATION—*as to time of assigning errors.* An assignment of cross-errors by a defendant in error will not be stricken out because not made within five years after the entry of the decree sought to be reviewed. The limitation of the statute in respect to a writ of error does not apply to the assignment of errors, but to the suing out of the writ. The statute gives the defendant in error or appellee the right to file cross-errors, and he may do so even after the five years which would bar a writ of error have expired.

4. LACHES—*as a bar to the setting aside of release of security, where the release was improperly made.* Several deeds of trust securing bonds were wrongfully released, without payment, or the knowledge or consent of the bondholders, and the trustees therein named, within one month after the recording of the releases (in violation of the agreement under which they were delivered) came to the knowledge of the bondholders, filed their bill to set aside the releases, and the holders of the major part of the bonds filed their

cross-bills, two and three years after, for the same purpose, and for a fore-closure of the trust deeds given to secure them. It was *held,* that *laches* was not attributable to them so as to bar their right to the equitable relief sought.

5. And where the holder of bonds placed them in the hands of a depositary, to be surrendered only upon the performance of certain conditions, and the trustee in the trust deed securing them, in 1873 released the trust deed, the conditions of the deposit not having been complied with, and the owner demanded a return of his bonds the next year, and obtained a judgment on the notes they were given as collaterals to secure, and in 1876 filed his cross-bill in another suit to have the release set aside and for a fore-closure, it was *held,* that there was no such acquiescence and *laches* as to bar his cross-bill.

6. ESCROW—*depositary as an agent.* The depositary of an *escrow* is a special and not a general agent, and the person dealing with him is bound to know the extent of his powers.

7. SAME—*delivery over without conditions performed.* The delivery of an *escrow* by the depositary to the grantee named therein, without a compliance with the conditions, is not a delivery with the assent of the grantor, and conveys no title. The authority of the depositary of an *escrow* is limited strictly to the conditions of the deposit, a compliance with which alone justifies its delivery.

8. PARTIES—*to bill to foreclose, generally—and where the beneficiaries are numerous.* It is a general rule in chancery that all persons interested in the subject matter of the suit should be made parties, and that in the case of a foreclosure of a deed of trust, the *cestuis que trust,* as well as the trustee, should be made parties to the foreclosure proceeding.

9. But where the beneficiaries are very numerous, and they are represented by their trustee, they need not all be made parties to a bill to foreclose a trust deed for their benefit. The impracticability of making all the persons interested parties, is a sufficient ground for dispensing with them. This case is held one in which all persons in interest need not be made parties.

10. SUBROGATION—*to prior liens paid off by subsequent incumbrancer.* Where a subsequent incumbrancer is compelled to pay off a prior trust deed to protect his interest, his subrogation to the rights under the trust deed to the extent of what he paid will be clearly right, and there will be no fraud in the debtor executing a subsequent deed of trust to give him a preference.

11. VENDOR'S LIEN—*effect of taking other security.* Where the vendor of land accepts as a security for the unpaid purchase money, bonds of the purchaser secured by a trust deed upon the land sold and conveyed, and other land, he waives all right to a vendor's lien.

12. ESTOPPEL—*by acts and acquiescence after acted upon by others.* A judgment creditor, at a general composition between the debtor and creditors, accepted bonds, secured by deed of trust, in lieu of his judgment, and gave an order to his attorney to satisfy the same, upon the faith of

which other creditors surrendered their securities and also accepted bonds so secured, and the judgment creditor acquiesced in such exchange for about three years. It was *held*, in a litigation where it was material to the interests of the other creditors that the transaction should stand, that he was estopped from repudiating his action, and could not have it cancelled merely on the ground that he did not understand the terms of the trust deed securing his bonds, and the court properly set aside his judgment.

13. REFERENCE TO MASTER—*whether necessary.* Where there are no complicated accounts to be settled in a suit for the adjustment of liens, etc., but the amounts due the parties, respectively, rest in computation only, after their rights are determined, there will be no error in not making a reference to a master to report the amounts due the several parties in interest.

14. CROSS-BILL—*whether necessary—in setting up a judgment against a foreclosure.* Where a judgment creditor, in answer to bills to foreclose deeds of trust, sets up his rights under his judgment, showing its date and amount, and the return of an execution unsatisfied, this will be sufficient to enable the court to protect his rights without his filing a cross-bill.

15. NOTICE—*substituting new report of sale—and giving additional decree—notice required.* After report of a sale under a decree of foreclosure has been confirmed, leave to file a substituted report of the sale, the original being lost, and a personal decree for any deficiency not realized by the sale, should not be allowed except upon notice to the defendant, or some one entitled to represent him.

16. SAME—*appearance by a receiver as waiver of notice—in case of a deficiency decree on foreclosure.* Where a receiver of an insolvent corporation was appointed in one of several suits to foreclose various deeds of trust, and had conferred on him powers, among others, to take charge of the property and collect the debts or claims, to compound for any of its debts, in his discretion, to prosecute and defend in the name of the corporation, or his own name, as receiver, all such suits, as he should deem expedient, employ all such attorneys as he should deem necessary and expedient in the management, protection and disposal of the property, etc., it was *held*, that his appearance by himself and attorney at the time of entering a deficiency decree in a foreclosure suit, obviated the necessity of any notice of the application for such decree, he being the proper person on whom to serve such notice.

17. MARSHALING ASSETS—*in case of a lien on two funds by a creditor— subsequent purchasers—sale in inverse order of alienation.* Where a creditor has a lien upon two funds in only one of which another party has an interest, that party has a right to compel the creditor first to exhaust the security in which such other party has no interest.

18. The owner of certain parcels of land gave deeds of trust on the same to secure certain of his bonds, after which releases from the trustee were placed upon record, in violation of the agreement under which they were placed in the hands of one *in escrow*, and a subsequent trust deed was made

securing other indebtedness, which made no provision for the security of the holders of the bonds under the prior trust deeds. On discovery of this, a conveyance of lots not included in the second trust deed was made to a third person, to secure such prior bondholders, including a part of the lots embraced in the first trust deeds: *Held*, on bill by such bondholders to set aside the releases and foreclose the first trust deeds, that the court should have decreed the sale of the lots so conveyed as a security, first, before those included in the last trust deed.

19. On the foreclosure of a trust deed upon lots, it appeared that certain of the lots had, after the making of the trust deed, been conveyed by the' owner of the equity of redemption to one in trust as trustee for a city, in July, 1874, and that certain other lots had been conveyed to another party on April 15, 1874, and the court ordered the lots last mentioned to be sold first: *Held*, that the decree was erroneous, in not ordering a sale in the inverse order of alienation.

20. Where a sale is ordered of property under a decree of foreclosure, and to satisfy other liens, as to such other liens the property subject thereto not embraced in the mortgage should first be sold, and in the inverse order of its alienation.

21. CHANCERY—*several causes heard together—of their disposition— omission to dispose of all.* Where several bills in chancery for the enforcement of conflicting claims and liens were heard together, under an agreement of all parties to the several suits, no decree was made as to one of the bills which simply sought to have a receiver appointed, which was done, and which bill might properly have been dismissed, it was *held*, that this omission to finally dispose of that suit was no ground for reversing the decrees in the several other cases, and was a mere oversight.

22. In the same proceeding, in the suit in which the receiver was appointed, a foreclosure was decreed without requiring the receiver to report, and from that ascertain whether he had any, and if so, how much, funds in his hands. This was not asked of the court, and the causes were all submitted for decision upon the proofs: *Held*, that the plaintiff in error could not be heard to make the objection in this court of the absence of evidence of what the receiver had done.

23. SAME—*of the decree in several consolidated cases—whether by one or separate decrees.* Where it was stipulated and agreed that various distinct bills and cross-bills, all filed by creditors and lienholders to settle their conflicting rights and priorities, should be heard together as one cause, and that the evidence in each case should be considered in every other suit, so far as applicable, it was *held*, that this was not a merger of all the cases in one for all purposes, but only for the hearing, and that there was no error in rendering separate decrees in the several cases instead of one for all of them.

24. SAME—*decree for several sales in favor of different parties.* Where different complainants have separate liens upon separate and distinct pieces

of property in part, and such liens are complicated, there will be no error in rendering a decree in the several suits, when heard as one cause, ordering separate sales of the same lots to pay different parties, and subject, to some extent, to prior liens, instead of one sale of the property unincumbered, to pay all the liens thereon, although the latter form of the decree might perhaps have been well adopted.

25. DECREE—*construed—as directing the mode of sale on foreclosure.* Where a deed of trust was given on the west one hundred acres of a quarter section of land, to secure a debt, and the land was afterward subdivided into lots and blocks, a decree of foreclosure ordered the sale of the premises: *Held*, that the decree did not require the sale of the property *en masse.* It would be the duty of the officer to sell by lots, if that could be done more advantageously, and if any of the lots had been sold by the owner, they should be sold last.

26. OWNERSHIP OF BONDS—*presumption from possession.* It is not incumbent on the owner of bonds issued by a corporation, payable to bearer, and intended to circulate from hand to hand, in seeking to recover upon them, to account how he or any previous holder obtained them. They will be presumed to be rightful holders until the contrary is shown.

27. MORTGAGE—*retiring a first issue of bonds with a new series—exchanging bonds for the lands mortgaged—releases by trustee in furtherance of such exchange.* Where a deed of trust contained a provision for retiring the bonds secured thereby, and the holders to take lots embraced in the deed, at their schedule prices, in lieu of bonds, to which the trustee was to make releases to any one procuring a deed for the equity of redemption, it was *held*, that a bondholder having procured a deed of the equity of redemption in lots from the mortgagor, even without consideration, had the right to take lots at their schedule price for bonds held by him of an equal amount, and that the court would compel the trustee to release lots so selected, from the trust deed, on tender of their price in bonds of the mortgagor, rightfully issued and delivered to him.

28. Under such a provision in a trust deed for securing the bonds of a private corporation for the exchange of bonds for property named in the deed, at their schedule price, when the proof makes the holder's title to bonds suspicious and uncertain, the trustee may properly refuse to release lots to him for such bonds. In such case his title to the bonds should be settled by an action at law.

29. SAME—*power of trustee to release—rights and remedies in case of wrongful release.* A trustee in a deed of trust has no power to release the same except upon the surrender and cancellation of the bonds it was given to secure. The placing such bonds in the hands of another *in escrow*, to be surrendered and cancelled upon the performance of a condition never performed, will not authorize the trustee to release the trust deed securing them, and if he does, the release may be set aside and the trust deed foreclosed at the suit of the owner of the bonds.

30. And if the releases so placed *in escrow* shall be placed upon record without such arrangements being made, and without the knowledge or consent of the bondholders, they may be set aside and the former security reinstated, even as against subsequent incumbrancers who may have been deceived by the recording of the releases.

31. SAME—*ratification of releases so wrongfully made.* In the case of such wrongful action of the trustee, the bringing of a personal action by the bondholders against the trustee, to recover damages, will not be taken as a ratification of the releases, so as to bar a subsequent suit to set them aside. Such personal action is no more than the pursuit of a cumulative remedy.

32. SAME—*setting aside fraudulent arrangement as to one, only.* Where creditors of a corporation are induced to surrender and cancel the evidences of their debts secured by deed of trust on real estate, and accept in lieu thereof bonds of the corporation secured by trust deed, the bonds being for a much larger sum than was secured in the first trust deed, upon the assurance that the second trust deed shall embrace the same lands as the first, and the corporation, before giving the second trust deed, conveys a part of the lots to secure a particular creditor, if such conveyance is set aside as fraudulent, it can not be set aside as to one of the creditors, only, who has exchanged old for new bonds. If the first deed of trust is to be enforced as to one of such creditors, it must be for all.

33. SAME—*preference to a prior lienholder.* Where one creditor secured by a prior trust deed, agreed to surrender the evidence of his debt and take bonds secured by a trust deed subsequent to other intervening incumbrances, upon the condition that he should receive a preference in security for the new bonds under the latter trust deed, which was given in it, it was *held,* that he was entitled to the preference or to be restored to his prior lien, there being no proof of fraud on the other creditors in giving such preference.

34. SAME—*right to foreclose trust deed before maturity of the bonds secured.* A railroad company issued its bonds giving a mortgage on its projected railroad, franchise and property, and other parties composing the railroad company gave a deed of trust upon real estate, further securing such bonds, which provided that, in case of a foreclosure and sale under the railroad mortgage the proceeds of sale should be insufficient to pay all the bonds in full, then the bonds should become due and payable forthwith. It appeared that a foreclosure of the railroad mortgage would have produced nothing, and would have been useless: *Held,* that as there was nothing to exhaust by a foreclosure of the railroad mortgage, it might be taken as an exhaustion of the property, and that a foreclosure of the trust deed might be had before the maturity of the bonds, the same as if the railroad mortgage had been foreclosed and nothing realized thereby.

35. SAME—*decree as to surplus on foreclosure.* On the foreclosure of a trust deed securing a large number of bonds, where there were prior liens as to part of the property, and other claims and interests involved, a decree that

any surplus, after paying the bondholders known, should be brought into court, to be subsequently distributed, under the direction of the court, to the holders of bonds and liens entitled to it, and reserving all questions not decided, for subsequent consideration, was proper.

APPEAL from the Appellate Court for the First District;—heard in that court on writ of error to the Circuit Court of Cook county; the Hon. E. S. WILLIAMS, Judge, presiding.

David A. Gage, being the owner of one thousand or eleven hundred acres of land, now constituting a part of Riverside, some time in June or July, 1868, with the aid of his friend, Obadiah Jackson, sold the same to Emery E. Childs, for $300,000, of which $20,000 was paid down, reserving one-tenth of the profits of the proposed scheme to Gage, and a like share for Jackson. Subsequent payments were made with money borrowed with Gage's knowledge. The next purchase was the "Prescott tract," of four hundred and three acres, for $40,000, one-fourth of which was paid in cash, and a deed of trust given to David H. Hills, to secure the balance. These lands, together with the "White tract," in all about sixteen hundred acres, compose the Riverside property. A series of costly improvements was commenced, principally on the Gage tract, on an extravagant scale, so that by October, 1871, a debt of nearly $2,000,000 was incurred, including purchase money owing and unpaid. Through Gage charters were obtained, under which the "Riverside Improvement Company," and the "Riverside Water and Gas Works Company," were organized early in 1869, the former with power to issue $600,000 in bonds, and the latter $1,000,000 of its bonds. William T. Allen, Alpheus C. Badger, Benjamin V. Page and Seneca D. Kimbark having become interested in the enterprise, became liable in large sums of money on account of the improvement company, and a large amount of their paper, as well as that of David S. Duncomb and J. L. Brownell, was in the hands of banks, in Chicago and else-

where, to be provided for by the improvement company, then holding the Riverside lots and lands.

. The first attempt to fund a portion of the Riverside debt was by the issue of six series of what are known as the "Page & Kimbark bonds," numbering twenty-five bonds each,—in all one hundred and fifty bonds, payable to bearer, three years after date, secured by six trust deeds, all dated in August, 1870, in which Benjamin V. Page and Seneca D. Kimbark were grantees. Each deed of trust purported to convey about eighteen whole and thirteen half lots. These bonds were sent to David S. Duncomb, in New York, who guaranteed their payment, sold them, and accounted for their proceeds. A part of them were guaranteed by Childs. Edwin M. Hukill acquired of these bonds, before maturity and for value, fifty; Horace C. Davis, through Hukill, twenty; Charles A. Cooper, ten; Nathaniel S. McFetridge, two; J. L. Brownell held twenty-eight, and the balance by Temple and others.

The second attempt at funding was made by means of what are called the "Church bonds," secured, or to have been secured, by a trust deed to Thomas Church, dated November 5, 1870. There were to have been two hundred of these bonds, for $1000 each, payable in three years, with ten per cent interest. Some of. these were sent to David S. Duncomb, in New York, and were by him put afloat. Church died, and the trust deed, if ever executed, was never recorded, and seems to have been destroyed. Calvin W. Gilfillan and Foster W. Mitchell claimed to hold, the one five and the other ten of these bonds, and to enforce the same, with accumulated interest, filed their bill, September 11, 1873, in the United States Circuit Court for the Northern District of Illinois.

The third attempt to fund the Riverside debts was by an attempted issue of $1,600,000 "Greenebaum bonds," as they are called,—$600,000 made by the improvement company, and secured by its deed of trust on three-eighths of the Riverside property, and $1,000,000 made by the water and gas

works company, and secured by its deed on five-eighths of the Riverside property. It was agreed that Gage should convey to the improvement company the land he had sold to Childs, who had assigned the contract of purchase to that company, and Gage was to be paid therefor in Greenebaum bonds. To enable the water and gas works company to secure the $1,000,000 of its bonds, the improvement company conveyed five-eighths of all the Riverside property to it.

With these bonds it was expected that all the debts would be paid, leaving a balance in the treasury. This involved the paying of the Prescott and the Sapieha deeds of trust, and the one hundred and twenty Gallup & Peabody bonds, all on the Prescott tract. Jackson, Gage's attorney, was selected to act as a clearing house, and an attempt was made to procure releases of the prior trust deeds so far as they related to the Gage property. The great fire here intervened, and the sale of these bonds failed, though the Greenebaum trust deeds were recorded. After the fire these bonds were, from time to time, used as collaterals by Childs to meet pressing calls upon the improvement company, and he renewed his efforts to negotiate them in a body, and in view of these circumstances Gage consented to deliver the deed he had made, dated July 1, 1871, and the same was recorded March 12, 1872. Childs, in the meantime, had procured releases of Page & Kimbark trust deeds to be left with Jackson, to be recorded on some contingency, which should protect or take up all the Page & Kimbark bonds. These releases, it is claimed, were recorded by mistake on the same day, March 12, 1872, without performance of the conditions.

Gage at this time claimed a balance of $450,000 against the improvement company, for purchase money, and for indorsed paper taken up by him, and when he conveyed to the company he took seven hundred and fifty-nine Greenebaum bonds, secured on a part of the Gage property, as a security for the gross debt. Failing to negotiate these bonds, and the fund-

ing of the debts having fallen through, the smaller creditors pressing for payment, and Sapieha having obtained a decree of foreclosure, under which a sale was advertised, in this emergency, Childs, president of the Riverside Improvement Company and of the Riverside Water and Gas Works Company, Leverett W. Murray, secretary thereof, Henry E. Seelye, treasurer of the first named company, (subsequently a receiver thereof,) Austin Stevens, David S. Duncomb, and some others, conceived the idea of organizing a corporation for the purpose of building a railroad from Chicago, via Riverside and Western Springs, to the Mississippi river. Accordingly a charter was obtained, and a corporation organized, under the name of the Chicago and Great Western Railroad Company. Another corporation was organized by Childs and his friends, called the Chicago and Great Western Railroad Construction Company, he and his friends composing its officers. A third corporation was organized, called the Chicago and Great Western Railroad Land Company,—Emery E. Childs, president, Leverett W. Murray, secretary, etc. The Riverside Improvement Company, and the Riverside Water and Gas Works Company, conveyed their lands to the Chicago and Great Western Railroad Land Company, on February 28, 1873. The Chicago and Great Western Railroad Company not owning any property aside from its franchise, issued $8,000,000 of bonds, secured by trust deed upon its (prospective) assets, to the Farmers' Loan and Trust Company of New York. The provisions of this trust deed will be hereafter noticed. The railroad company's bonds were to be further secured by a deed of trust from the land company to John N. Jewett, of all the lands conveyed to it by the Riverside companies.

The various claims against the improvement company, and collaterals, were deposited with Jewett, who was made a clearing house, and new securities were to be given in exchange for them when the day of clearing arrived. He kept a book in which the old securities were entered and the stipulation

27—112 ILL.

for new ones in exchange, giving also his agreement in writing in each case, in conformity with the respective contracts of exchange, the whole being dependent upon his decision as to the clearing up of all liens, judgments, mortgages, trust deeds, and that the title was vested in him under .the deed of trust of the land company to him, dated March 1, 1873, except as to lots therein stated as under incumbrance. This trust deed was to secure the first $1,000,000 in bonds issued by the railroad company. By the arrangement made, parties, such as Gage, Smiths, Allen, Badger, Gregory, Gookins, and others, holding Greenebaum bonds, were to take in exchange therefor, some all railroad bonds, some railroad bonds and land company stock, and some railroad bonds, land company stock and construction company stock, as might have been agreed.

In the preparation for the June clearing, it was discovered that the Page & Kimbark trust deeds had been released, leaving the one hundred and fifty bonds therein secured, without any security. To provide for such of these bonds as were guaranteed by Duncomb, a deed absolute on its face, but really in trust to pay these bonds and to indemnify Duncomb on his guaranty, was made to Austin Stevens, and for no other purpose. The lots in this Stevens deed were one hundred and fifty-six in number. Gage, as well as Jewett, his attorney, had knowledge of this conveyance to Stevens. Samuel B. Gookins and Charles A. Gregory claimed to have a special arrangement with Jewett that they were to have first mortgage bonds, with the exception that enough bonds should be preferred to pay the Sapieha claim, amounting to $75,000. Alpheus C. Badger, who had a claim on one hundred and nineteen Gallup & Peabody bonds, secured on the Prescott tract, which were pledged as collateral in the Third National Bank of Chicago, also required that if he and the bank released these securities, he should be preferred with the Sapieha and Prescott claims.

Before this time, Walter L. Peck, Ferdinand W. Peck, Clarence I. Peck, Thomas C. Hill and William R. Page, partners, under the title of East Hinsdale Company, afterwards the Western Springs Company, not being creditors of the improvement company, were induced to enter into an agreement to advance $80,000 to meet the Sapieha claim and save a sacrifice of property, for which they received $100,000 in railroad bonds, numbered from 1 to 100, inclusive, as collaterals to the notes of the land company for $80,000. Badger, for himself and the Third National Bank, got the second $100,000 in railroad bonds, the trust deed providing that said two hundred bonds should be paid in the order of their numbers in case of foreclosure under the power therein or by decree of court. There was no other provision for a preference of these two hundred, or any other of the first one thousand bonds, which were preferred over the remaining $7,000,000 of railroad bonds. The Jewett trust deed provided that it could be foreclosed only after a foreclosure and sale under the railroad trust deed was made, when, in case of a deficit, all the bonds should be deemed due, and the Jewett trust deed might be immediately foreclosed by the trustee to pay the deficiency. There was no provision therein for declaring the bonds due before the foreclosure of the railroad trust deed. The railroad trust deed to the Farmers' Loan and Trust Company provided that the trustee might, on request of ten or more bondholders of at least $1,000,000 in bonds, take possession of the road, etc., and operate, for default in payment of interest, using profits to pay interest; and that on default in payment of interest for six months, any ten or more bondholders having at least $1,000,000 in bonds, might elect and declare the principal of all bonds due and payable; or that a like election and declaration might, on request of the same number and amount of bondholders, be made by the trustee therein, who might thereafter foreclose for principal and unpaid interest, either under the power, or in chancery.

In the early part of June, 1873, all the securities were exchanged and the clearings made, and all parties either then took the new securities, or Jewett was authorized to make, and did make, the exchanges, as is claimed, and the parties then or afterwards took their new securities under circumstances which is claimed to have been an acceptance, except Gookins, who held fourteen of the Greenebaum bonds, Sapieha, who took his money advanced by the Pecks, and Prescott. To pay off the Prescott claim, Stevens took thirty bonds to New York on which to raise money, but failed to do so. The Prescott claim ripened into a decree, July 7, 1873, for over $22,000. There was a clause in the Jewett trust deed by which bonds could be retired and the holders take lots. On a schedule being made and approved, any party getting a deed of the land company's equity of redemption, and paying Jewett, the trustee, the schedule price in bonds, was entitled to a release of the lots embraced in the land company's deed. Such a schedule of prices was duly made and approved in triplicate, but Jewett afterwards refused to release lots under this clause.

On the June, 1873, clearing, Jewett delivered railroad bonds as follows: To Pecks, Hill & Page, one hundred; to Badger, for the Third National Bank, one hundred; to Mead & Clark, (taken by Stevens to New York and returned to Jewett,) on which they were to advance money to pay the Prescott claim, thirty; H. W. Cood, fifteen; H. F. Eames, ten; Commercial National Bank, eleven; R. Edwards, eight; S. M. Nickerson, six; Mechanics' National Bank, seventeen; R. M. Whipple, ten; Sleeper & Whiton, two; Charles A. Gregory, sixty-five; S. B. Gookins, eleven; I. Holmes, four; Crane Manufacturing Company, six; Kelly & Bro., one; E. S. Hunt, one; S. Whittier, one; Hoyne, Horton & Hoyne, one; Harris & Co., one; David A. Gage, two hundred and fifty; F. Jaeger, four; C. M. Smith, twelve; National Loan and Trust Company, five; W. Voorhies, eight; M. O'Brien, one; Wm. T. Allen,

sixteen; H. Greenebaum, eight; same, five, (two to secure against the two missing Greenebaum bonds); George Krick, four; J. Davis & Co., one; H. K. Elkins, seven; Dr. Gibbs, four; John Adriance, twenty-five. John N. Jewett retained two hundred and fifty, which were to be used to release the incumbered lots. Gage had agreed to take three hundred railroad bonds of the first one thousand, and stocks in the railroad land company and construction company, in one or all, to settle his debt, lumped at $450,000. The bonds fell short, and Gage consented to the distribution and to take a less amount of bonds, as might afterwards be agreed.

Page & Kimbark, on September 12, 1873, filed their bill against Austin Stevens and others, to set aside the releases of the six deeds of trust given by the improvement company to complainants, in August, 1870, as having been delivered and recorded contrary to the conditions on which they had been left with the depositary, and in case the releases were held valid, praying that the lots conveyed to Stevens might be subjected to the payment of the bonds originally secured by the trust deeds to Page & Kimbark.

Edwin M. Hukill, on January 20, 1875, filed his cross-bill in the preceding case against Page & Kimbark, seeking a personal decree against Page & Kimbark, for a violation of duty in releasing the trust deeds to them.

Alpheus C. Badger, on July 22, 1874, filed his bill against the Chicago and Great Western Railroad Company, the land company, Childs, Murray and Jewett, seeking to enforce a claim in his own behalf and in behalf of the Third National Bank and others, to the second hundred of the two hundred preferred bonds, in case of a sale or foreclosure of the Jewett trust deed. Of these one hundred bonds, the Third National Bank held sixty, the other forty having been pledged,—twenty to two Wisconsin banks, and twenty to relatives of Badger. Badger's claim to these one hundred railroad bonds was based upon the one hundred and nineteen Gallup & Peabody

bonds which he had pledged, and they were delivered to him in exchange for the Gallup & Peabody bonds which were issued to raise money to pay the Sapieha claim. Badger had turned out these Gallup & Peabody bonds to the Third National Bank, to secure it for any balance of money his firm owed that bank.

David A. Gage, on July 22, 1874, filed his original bill against the Riverside Improvement Company and others, seeking to set aside all of the conveyances of the improvement company and the water and gas works company to the land company, and have the Greenebaum trust deed reinstated as to the lien of his seven hundred and fifty-nine bonds, and to require Jewett to re-deliver the same, with the Duncomb and Brownell notes, to Gage, or, in case Childs held them, he be required to do the same, and that Stevens reconvey to the improvement company; that a receiver be appointed; that the hotel company property, and Childs' and Murray's residences, might be decreed to the improvement company, and that the Greenebaum trust deed be foreclosed, and the lands be subjected to the payment of what was due Gage. The bill, among other things, charged that the land company was unauthorized by its charter to take and hold real estate, and that the deeds to it by the improvement company and the water and gas works company were void, and that the land company had no power, either by the Jewett trust deed or by any of its numerous deeds to other parties. After the hearing, Gage dismissed his bill as to Gaytes, George C. Smith, Charles M. Smith, Horace A. Hurlbut, Henry E. Seelye and Joshua C. Sanders. A demurrer was filed by Gregory, which was overruled, and he abided his demurrer.

Walter L. Peck, Ferdinand W. Peck, Clarence I. Peck, Thomas C. Hill and William R. Page, on October 9, 1874, filed their original bill against the Chicago and Great Western Railroad Land Company and others, (which is called the

"Peck bill,") seeking to reform the Jewett trust deed in certain respects, and to foreclose the same when corrected, and to be subrogated to the rights of Sapieha and Prescott, growing out of their advance to pay the Sapieha claim, and the assignment of the Prescott decree. The complainants in this bill sold the bonds held by them as collaterals, for a default in the payment of interest, and became the purchasers, and this is claimed to be invalid for two reasons: First, that a person can not become a purchaser at his own sale; and second, the power of sale could be exercised only on the maturity of the notes they were given to secure, or in case of a depreciation in their value. It was claimed in this bill that the first hundred of the bonds were to be a first lien in the Jewett trust deed; that on default in the payment of said bonds, or the coupons thereto attached, or any part thereof, the holder or holders of any ten of such bonds might declare the whole of said bonds, principal and interest, due, and the trustee might sell the mortgaged property; that on application of any one to exchange bonds for lots at their schedule prices, notice should be given to the complainants, and that they have the first privilege of such exchange; and that at the time they paid the $75,000 they were assured by Jewett, Childs, Murray and Allen that the deed of trust contained the foregoing provisions, whereas the trust deed preferred the first two hundred of said bonds, and omitted the clause as to the right to declare all bonds due by the holder or holders of ten bonds, and have a foreclosure, and had in lieu thereof a clause making a foreclosure of the railroad trust deed to the Farmers' Loan and Trust Company a condition precedent to the foreclosure of the Jewett trust deed, and that the clause requiring notice to be given to the holders of the first one hundred bonds in case of a sale, was omitted. In these respects the Jewett deed was sought to be reformed, and then foreclosed. The bill further alleged that Stevens failed to pay off the Prescott mortgage, but converted to his

own use the thirty bonds taken by him to New York with which to discharge such mortgage, and that to protect their interest complainants were obliged to purchase the Prescott mortgage, and paid therefor $24,000.

Joshua C. Sanders, on January 2, 1875, filed in the Peck suit his cross-bill against Walter L. Peck and others, in which he sets up his purchase of one hundred and ninety-five bonds, secured by the Jewett trust deed, after examining the conditions of such deed as to retiring bonds in payment for lots; that he bought of the land company the equity of redemption of three hundred lots, which were described,—took the land company's deed therefor, and tendered the one hundred and ninety-five bonds, (enough to pay for the lots at schedule prices,) and demanded releases of said lots, producing his deed from the land company, and that Jewett refused to release the lots. A decree was asked requiring Jewett to make the release of the three hundred lots.

The cross-bill of the city of Chicago, filed February 11, 1876, against Walter L. Peck and others, alleged that on December 27, 1873, David A. Gage, being indebted to the city in more than half a million dollars, and unable to pay it, transferred to George Taylor, trustee, three hundred and fifty bonds of the railroad company, secured by the Jewett trust deed, and that Gage, in July, 1874, as a further security to the city, obtained by the land company the execution of five deeds, conveying lands at Riverside to Taylor, as trustee, etc., and prayed that Gage might be compelled to protect the interest of the city, and that the city might be subrogated to the rights of Gage, if he should be held to have rights, in lieu of the bonds transferred as above stated.

The cross-bill of Samuel B. Gookins and Elizabeth S. Newton, filed in the Peck suit, on February 18, 1876, against Peck and others, alleged that on May 15, 1872, the Riverside Improvement Company made its two notes of that date, each for $5000, with interest, payable in eight and twelve months,

to the order of Emery E. Childs; that Gookins, finding these notes in the market, with fourteen Riverside Water and Gas Works Company bonds as collateral security, purchased such notes before maturity, and the collaterals; that said notes and bonds were delivered to Jewett *in escrow*, and only to be delivered up upon the execution of the Jewett trust deed and the delivery to Gookins of eleven bonds of the Chicago and Great Western Railroad Company, of $1000 each, dated March 1, 1873, to be secured by trust deed to the Farmers' Loan and Trust Company, and the Jewett trust deed, such bonds to be within the class to be first paid out of the property mentioned in said trust deeds, saving only the $75,000 Peck claim, the priority of which was conceded, and upon Jewett also receiving for Gookins one hundred and ten shares of the dividend warrants of the Great Western Construction Company; that Jewett, on the deposit of the notes and bonds with him, executed an agreement in writing, specifying the terms upon which he had received the same; that six months after the delivery and recording of the Jewett trust deed, Murray, the secretary of the land company, offered him eleven bonds with the first interest coupons cut off, and he refused to receive the same, which were then in the hands of Jewett. Gookins therefore claims that he holds the fourteen bonds of the water and gas works company as collateral to said notes, and that the same are still in full force; that if Greenebaum has released the trust deed, it is invalid as against him, (Gookins), or, if effectual, Greenebaum is liable for releasing said deed of trust, and that Jewett, having concurred in the same, is also liable. Gookins further states, that on April 8, 1874, he obtained a judgment in the Superior Court of Cook county, against the Riverside Improvement Company, for $11,900, and costs, and that in June, 1872, he assigned to his co-complainant an equitable interest in the decree, and prays that complainants may be decreed to be the owners of the Riverside bonds; that the trust deed to Greenebaum,

securing the same and other bonds, may stand as security for said fourteen bonds, and that the same may be foreclosed. On the other hand, it is claimed that Gookins made Jewett his agent, and is therefore bound by his acts.

William T. Allen also filed his cross-bill in the Peck suit, in which he alleges that on November 12, 1872, he agreed, in writing, with Childs, to put all his claims ($40,000) against the Riverside Improvement Company in the hands of Jewett, with all collaterals, Childs to give him (Allen) sixteen bonds of the railroad company, of $1000 each, and $12,000 of stock of the construction company,—the sixteen bonds to be a first lien, and part of the first $1,000,000 of bonds; that he gave certain securities to Jewett, and took his receipt that they should be disposed of as provided in the written memorandum; that Childs made certain representations to him, and relying upon which, he called upon Jewett and obtained his bonds; that Childs conspired with Duncomb, Stevens, Badger and others, to deceive and defraud complainant of his rights, by giving a preference to two hundred bonds, and thus make complainant's bonds a third lien, and omitted from the Jewett trust deed certain property which should have been included therein; denies the legal existence of both the railroad and the land corporation, and the conveyance of the property by the Riverside Improvement Company to said corporations, and prays that the exchange made by complainant of his securities with Childs may be declared void, and complainant remitted to his rights as the holder of the bonds delivered to Jewett, and that the Jewett trust deed be declared null and void.

Horace A. Hurlbut filed his cross-bill in the Peck suit, in which he alleged the making of the Jewett trust deed to secure the railroad bonds; that he became the owner of eighteen of such bonds, and set up the provision in the trust deed for the sale of lots by the land company at schedule prices, and the release of said lots by Jewett, the trustee, upon receipt of

bonds; that he bought thirty-five of said lots; taking a deed from the land company therefor, and that he tendered bonds to Jewett, and demanded a release of the lots, which Jewett refused, and prayed to have such lots released. Peck and his co-complainants answered, denying that·Hurlbut became the owner, for value, of any of the bonds secured by the Jewett trust deed, and charging that he obtained the same by collusion, and averred that the terms and conditions of the Jewett trust deed, in regard to the sale and release of lots, were never complied with, and that no proper schedule was ever made of the prices of the lots.

The cross-bill of Charles M. Smith set up a claim to sixteen lots bought, and sought to have the same released from the Jewett trust deed, as in the Hurlbut cross-bill.

These cases,—four original bills and eight cross-bills,—by agreement of all parties, were heard together, with the understanding that the testimony taken at the hearing should, so far as applicable, be considered in and applied to each case. The court decreed substantially as follows:

*First*—Dismissing the Peck bill as to Park, Reynolds, George C. Smith, Green, Hall & Frost, Henning, Voorhies and the Woodwards, Gaytes, Marks and·Osborn.

*Second*—Giving a lien to Gage for $4300, and interest from October 16, 1873, and to Peck *et al.* for $20,000, and interest from August 11, 1872, at ten per cent, and the further sum of $2095.60, and interest from June 8, 1874, to be paid out of the proceeds of sale by Hills, trustee under the Prescott decree. If proceeds not sufficient, Gage to share *pro rata* with Peck *et al.*

*Third*—Setting aside the Sanders deeds, and dismissing Sanders' cross-bill, without prejudice as to any claim he may have, as a *bona fide* holder of railroad bonds, to share in the distribution of bonds numbered from 100 upwards.

*Fourth*—Giving the city of Chicago the benefit of the three hundred and fifty bonds received of Gage, in Taylor's hands,

to share with the other holders of railroad bonds above No. 100, in any distribution of proceeds of sale on foreclosure, and if more than Gage owed the city was realized, the surplus to go to Gage; and adjudging the city to be entitled to the equity of redemption of the lands conveyed in the five deeds of the land company to Taylor, trustee, and that the lots conveyed therein, except two lots, be sold last on the foreclosure sale.

*Fifth*—Dismissing the Allen cross-bill, and providing for his bonds to share in the distribution of surplus of proceeds of sale, as for Sanders and the city of Chicago.

*Sixth*—Setting aside deed of land company to Hurlbut, of his thirty-five lots, and dismissing his cross-bill, with costs, without providing for any distribution as to his bonds, even as to the three held by Smith, and tendered for his lots.

*Seventh*—Setting aside the deeds of the three lots to Charles M. Smith, and providing, in the cancellation of Smith's eight bonds, that Jewett release to Smith his sixteen other lots conveyed to him by the land company, but that they be held still subject to the lien of the Greenebaum trust deed.

*Eighth*—That Gregory and Shaw enter satisfaction of the $13,091.21 judgment, and that the Jewett trust deed was a valid lien to secure *lawfully* issued railroad bonds on all lands therein described, except as thereinafter excepted.

*Ninth*—That the Peck bonds, numbered from 1 to 100, and none others, were entitled to a preference, and found it useless to require a foreclosure of the railroad deed of trust before that to Jewett, and providing for a sale for non-payment of sums found due, Peck *et al.* to be first paid, and the balance brought into court, and also establishing the order of sale under the Jewett trust deed.

*Tenth*—In the Hukill *et al.* cross-bill, the four trust deeds securing the Page & Kimbark bonds were held valid and binding liens, and the releases thereof were set aside, and it was decreed that none of the other deeds should be a cloud

upon the title to the lots in the Page & Kimbark trust deeds held by the complainants. There was found to be due from the improvement company to Hukill, $72,500; to Davis, $29,000; to Cooper, $21,750; and to McFetridge, $2900,— which sums were ordered to be paid within ten days, and in default of such payment, the lots in the Page & Kimbark trust deeds be sold in the inverse order of their alienation, and in case enough was not realized to pay said sums, with interest and costs, then enough of the Stevens lots be sold.

*Eleventh*—As to the Gookins and Newton cross-bill, the decree found that the fourteen Greenebaum bonds were deposited with Jewett on the conditions stated in the bill, which were never complied with, and that the release of the Greenebaum trust deed was fraudulent as against said bonds, and that Mrs. Newton was entitled to said bonds, uncancelled, as collateral to the judgment on the notes for $14,208.54, and set aside the release as to such bonds, and ordered a foreclosure of said trust deed, and a sale of lots in default of payment in the time fixed.

This decree directed, first, that certain lots, (named,) then an undivided five-eighths of certain land subject to the lien of the Prescott decree, then an undivided five-eighths of certain other premises subject to the Prescott lien, and then other lots subject to the superior right of Hukill and others, as declared in the decrees in their cross-bills, and then certain lots, be sold, subject to the superior rights and equities of the complainants in the Peck bill, and to any equity arising under incumbrances mentioned in the Jewett trust deed; and then, if the lands so sold are insufficient to pay the Gookins-Newton decree, it prescribed to be next sold other lands, on which the decree states that the complainants in the Peck bill have rights inferior and subject to those of Gookins and Newton. The decree required any surplus to be brought into court, subject to its further order.

On June 30, 1882, a writ of error was sued out of the Appellate Court for the First District, to review the proceedings of the circuit court of Cook county, by the Chicago and Great Western Railroad Land Company, Alpheus C. Badger, Henry E. Seelye, the Third National Bank of Chicago, Charles A. Gregory, Theodore A. Shaw, Charles M. Smith, Horace A. Hurlbut, George C. Smith and William T. Allen. At the October term of the Appellate Court, Joshua C. Sanders appeared, and asked leave to assign errors upon the record, which was afterwards granted, and he assigned errors accordingly. The other defendants in error moved to dismiss the writ of error because a question of freehold was involved, which motion·was reserved until the final hearing, when it was denied by an affirmance of the decree below. On May 2, 1883, David A. Gage moved to quash the writ of error as to the Gage suit, because it was sued out in several different suits, and for a misjoinder of parties in such suit. On May 4, 1883, George C. Smith, one of the plaintiffs in error, moved to dismiss the writ of error as to himself. Upon the argument, defendants in error moved to strike from the files the errors assigned by Sanders, because not assigned within five years. The court took these motions under advisement, and afterwards affirmed the decree of the circuit court, generally, without otherwise deciding any of the motions taken under advisement. The Chicago and Great Western Railroad Land Company, Alpheus C. Badger, Henry E. Seelye, the Third National Bank of Chicago, Charles A. Gregory, Theodore A. Shaw, Charles M. Smith, Horace A. Hurlbut, William T. Allen and Joshua C. Sanders bring the case to the Supreme Court, by appeal, and assign for error the affirmance of the decree, and George C. Smith assigns for error that the court did not allow his motion to dismiss the writ of error as to himself, and the appellees assign for error that the Appellate Court erred in not dismissing the writ of error for want of jurisdiction.

Mr. H. E. SEELYE, and Messrs. QUICK & MILLER, for the appellants.

Messrs. GRANT & BRADY, for the appellants Gregory and Shaw.

Messrs. PAGE & BOOTH, and Mr. LYMAN TRUMBULL, for the appellees Peck, Hill and Page.

Messrs. CAMPBELL & LAWRENCE, for the appellee Gage.

Mr. B. C. COOK, for the appellees Hukill, Cooper, Davis and McFetridge.

Mr. GEORGE W. SMITH, for the appellees Page and Kimbark.

Messrs. ROBERTS & HUTCHINSON, for the appellee Newton.

Mr. JUSTICE SHELDON delivered the opinion of the Court:

There are some preliminary questions, here, which may properly be first considered.

It is insisted that there is a freehold involved, and that the motion made in the Appellate Court to dismiss the writ of error there, on that ground, should have been sustained, under the provision of the statute requiring appeals and writs of error, in cases where a freehold is involved, to be prosecuted directly to and sued out from the Supreme Court. It is true that the decree does set aside certain deeds, and there may be found, perhaps, in one of the cross-bills, a prayer that they should be set aside; but the primary object was not the recovery, directly, of any freehold estate. The Peck bill, which was the main bill, was purely one to correct and foreclose the Jewett trust deed, making no attack upon titles. Sanders, Smith and Hurlbut filed cross-bills in this Peck suit, claiming the equity of redemption to certain lots covered by the Jewett trust deed, as subsequent grantees of the Chicago and Great Western Railroad Land Company, the makers of the

trust deed, and claimed also to be holders of bonds secured by
the trust deed, and to be entitled to have their lots released
from the trust deed on surrender of their bonds, in accord-
ance with a provision in the trust deed that on presentation
of a deed of the equity of redemption of any lots, and bonds
to the amount of the schedule price fixed upon such lots, the
trustee should make release of them. We regard these cross-
bills as essentially but bills to redeem,—to have released lots
of which the equity of redemption was held, upon surrender of
the bonds,—and any cross-bill in any of the cases which may
ask to have these deeds set aside, we view but as a proceed-
ing in opposition to the right of redemption. These deeds to
Sanders, Smith and Hurlbut were set aside by the decree,
which was in effect a denial of their right of redemption.
We believe there was but one other deed set aside,—that to
Stevens,—and his deed was but a mortgage. We regard the
scope of the whole litigation as involving but the enforcement
of liens on real estate, by mortgage or otherwise, the estab-
lishment of such liens, the release of and redemption from
them, and the resistance of such redemption,—all on the part
of creditors, there being no adverse claims of title arrayed
against each other. In the determination of such questions
no freehold is involved, as this court has frequently decided.
(*Carbine* v. *Fox*, 98 Ill. 146; *McIntyre* v. *Yates*, 100 id. 475;
*Conkey* v. *Knight*, 104 id. 337.) We said in *Chicago, Burling-
ton and Quincy Railroad Co.* v. *Watson*, 105 Ill. 222: "A
freehold is never involved, within the meaning of the statute,
except where the primary object of the suit is a recovery of
a freehold estate the title whereof is directly put in issue,
and where the suit, if prosecuted to a final determination,
will, by virtue of the judgment or decree rendered therein, as
between the parties, result in one gaining and the other losing
the estate." No such result follows here by virtue of the
decree, but the effect is to subject the property to be sold, for
the satisfaction of the liens upon it.

We do not regard the finding in the decree that the Chicago and Great Western Railroad Land Company, (the mortgagor,) at the execution of the Jewett trust deed, owned the lands therein described in fee simple, as involving any freehold, as is claimed. That is but a common allegation in bills of foreclosure, and a common finding in foreclosure decrees. There being no claim of an adverse title, the allegation and finding amount really to no more than there was a valid mortgage of the lands made.

There was a motion made in the Appellate Court to quash the writ of error because of misjoinder of causes and parties, in that it issued to bring up on a single writ several distinct and separate causes, wherein the parties were not the same, the pleadings were different in the allegations and prayers for relief, and the decrees were separate, and granted different relief to different parties. The not granting of this motion is assigned for error. There were originally in the circuit court four original bills in chancery, called, after the complainants, respectively, the Peck suit, the Gage suit, the Badger suit, and the Page & Kimbark suit. In the Peck suit seven cross-bills were filed, and one in the Page & Kimbark suit. These bills and cross-bills were all filed by creditors and lienholders of the Riverside land companies, and involved the settlement of the various and conflicting claims and liens of these creditors upon lands in Riverside. The following agreement was made in open court, and entered of record in the common certificate of evidence: "Be it remembered, that on the hearing of these causes it was agreed between all the counsel representing the different parties, and each and every interest before the court, that all of said causes should be heard, tried and determined together, as one cause, with the agreement and understanding between counsel that all the testimony or evidence introduced or heard at the hearing, in any one or more of said causes, should apply to every other of said causes on hearing, so far as the same should be appli-

28—112 ILL.

cable, and should be considered in each case by the court."
Separate decrees were entered in the several suits. One common certificate of evidence entitled in all the bills and cross-bills was signed, and filed, and made the common record of all. In at least two instances pleadings in one case were made a part of those in another, by reference. The causes having been in the circuit court all heard and determined together as one cause, and having one common certificate of evidence, in order to a proper review of the decree of the circuit court in the Appellate Court we think the mode of review in the latter court should be the same as that of the hearing in the former,—that is, that all the causes should be reviewed and determined together as one cause in the Appellate Court, and that a single writ of error might properly remove the record of all the causes together, as done in this case.

It is assigned for error that the Appellate Court did not allow the motion made to strike out the errors assigned in that court, by Joshua C. Sanders. That motion was on the ground that the errors were assigned after the five years limited for suing out a writ of error. Sanders was not one of the original parties plaintiff in error, but upon the first day of the October term, 1882, of the Appellate Court, to which the writ of error was made returnable, he appeared in court and filed his motion for leave to assign cross-errors. He adopted and assigned certain of the errors previously assigned by plaintiffs in error, and in addition assigned four other errors relating to his own case. The limitation of the statute does not apply to the assignment of errors, but to suing out the writ. (Rev. Stat. chap. 110, sec. 86.) The errors are assigned *on the record*, which may not be filed until after the five years expire. Where the writ is sued out on the last day of the five years, and is made returnable after the five years have expired, as in the present case, it seems plain that defendants in error may assign cross-errors after the expira-

tion of the five years. The statute provides that in all cases of appeal or writ of error, defendant in error may assign cross-errors. Rev. Stat. chap. 110, sec. 79.

Complaint is made that all the causes were not determined as one, and one decree entered. The purport of the agreement made was not that all the cases were to be merged in one for all purposes, but they were to be heard and determined together as one cause, the evidence in any one or more of the cases to be "considered in each case by the court," so far as applicable. It was consistent with this that so much of the decree as affected one party, only, should be entered by itself, and it is not perceived how plaintiffs in error are prejudiced by the manner in which the decree was entered,—whether in parts, or all together.

Objection is taken that there were other necessary parties not made parties to the several bills,—that all the *cestuis que trust,* to-wit, the bondholders under the Jewett trust deed, should have been made parties by name. The general rule is, that all persons interested in the subject matter of the suit are to be made parties, and that the *cestuis que trust,* as well as the trustee, should be made parties to a foreclosure proceeding; but there is an established exception to this rule where the beneficiaries are very numerous, and certain parties to the suit are entitled to be deemed their full representatives. It has been laid down by Lord REDESDALE as a general rule, that where any persons are made trustees for the payment of debts and legacies, they may sustain a suit, either as plaintiffs or as defendants, without bringing before the court the creditors or legatees for whom they are trustees, which in many cases would be impossible. Indeed, the impracticability of making the other persons parties would seem of itself a sufficient ground for dispensing with them. (Story's Eq. Pl. sec. 150.) In *Van Vechten* v. *Terry,* 2 Johns. Ch. 197, where a demurrer was filed to a bill brought by trustees, without making the *cestuis que trust,* two hundred and fifty in

number, parties, Chancellor KENT, in overruling the demurrer, said: "The trustees are sufficient for the purpose of this bill, which is for a sale of the pledge. It would be intolerably oppressive and burdensome to bring in all the *cestuis que trust.* The delay and the expense of such a proceeding would be a reflection on the justice of the court. This is one of those cases in which the general rule can not and need not be enforced, for the trustees sufficiently represent all the interests concerned; they were selected by the association for that purpose, and we need not look beyond them." And see *Shaw et al.* v. *N. C. R. Co. et al.* 5 Gray, 162; Story's Eq. Pl. secs. 142, 216, 217. We regard the present as a clear case within the exception to the general rule of equity pleading, that all persons interested in the subject matter of the suit must be made parties to the bill.

It is objected the causes were not referred to a master to report the amounts due. There are no complicated accounts here, as in cases where we have required there should be a reference to a master. As soon as the rights of the parties were settled, determining the amount due any of the parties in whose favor decrees were entered was but a matter of the computation of interest on fixed amounts, and finding the sum of the principal and interest.

Error is assigned in the decreeing several sales to pay different parties, and subject, to some extent, to prior liens, instead of one sale of the property unincumbered, to pay all. Although perhaps the latter form of decree might well enough have been adopted, yet as different complainants had separate liens upon separate and distinct pieces of property, which were all being foreclosed, we can not say, with the complication of liens which existed, and the mode of submission of the causes for determination, that there was essential error in the decree made here, to sell each specific piece of property subject to a deed of trust or mortgage, under a decree entered upon a proceeding to foreclose such deed of trust or

mortgage, and subject to prior liens upon such premises, all such liens and their amounts being established by the same decree.

Complaint is made of the order in which the lands were decreed to be sold, and that it was not in the inverse order of alienation. The decree aimed, as would seem, to observe the rule of selling first the premises last conveyed, and so far as relates to foreclosure of the Jewett trust deed we find no cause of complaint of the violation of the rule. Whether it was fully observed in other cases will be further remarked upon hereafter.

There is somewhat of confusion in the decree in declaring the amount found to be due to Peck *et al.*, as complained of; but we think that, taking the whole decree together, it appears with reasonable certainty what the amount was which was declared to be due.

Complaint is made that the sum due each and all the bondholders was not ascertained, and provision made for distribution of surplus of proceeds of sale among them. The decree did direct that the surplus, if any, should be brought into court, to be subsequently distributed, under direction of the court, to the holders of bonds entitled to it, and that "all questions arising in this cause not herein or heretofore adjudicated by the court, are reserved for future consideration." This would seem to be all that was practicable, and to be sufficient in this respect. It is said that at least the amount due on the Jewett trust deed should have been expressly established,—whether it was simply on the interest coupons, or whether it was for the whole one thousand bonds and accrued interest. We understand the decree to do this in its statement "that the principal of said bonds is hereby declared to be due."

It is complained that the agreement of submission was violated, as the Badger suit was not determined, no final decree appearing therein. Of this suit plaintiffs in error themselves

say: "This bill was filed without any precedent to justify it. It should have been dismissed." It was a bill merely for the appointment of a receiver, and its purpose having been accomplished in the making of such appointment, the cause would seem to have been overlooked, and not formally disposed of. It is said the court should have required the receiver to report, and by his accounts determine the fact whether he had any funds in his hands, and how much, and have applied it, or at least ascertained how he had expended what he had. Such action was not asked of the court below, and after having submitted the cause for determination upon such proofs as had been taken, it does not lie with plaintiffs in error to make objection now of the absence of evidence of what the receiver had done.

We now come to the consideration of questions of more substantial nature, and arising upon errors more specially assigned by the respective plaintiffs in error.

It is denied that there was a present right of foreclosure of the Jewett trust deed. That trust deed was given to secure the payment of railroad bonds issued by the Chicago and Great Western Railroad Company. The railroad bonds had not become due by the terms thereof. The only way in which they could otherwise be made due, was after the foreclosure of the railroad mortgage. The railroad company itself had given its own mortgage on its railroad, franchise and property, to secure the payment of these bonds which it issued.

There was, in the Jewett trust deed, the provision that in case of foreclosure and sale under the railroad mortgage the proceeds of the sale should be insufficient to pay all the bonds in full, that then, and in that case, the bonds should be and be deemed due and payable, the same as if the bonds had become due and payable by the terms thereof. It is under and by virtue of this provision that it is claimed the bonds were due at the time of the filing of the bill. The railroad mortgage had not been foreclosed. But the evidence estab-

lishes that its foreclosure would have produced nothing, and would have been futile. The transaction of making the bonds and mortgage, took place in June, 1873. In September of that year came the financial panic, and there was an utter collapse of the railroad enterprise. Not one of the bonds, by which it was expected to build the road, could be sold upon the market; no part of the road was built; the company had not a dollar's worth of property,—nothing whatever more than its franchise. Its existence was hardly more than on paper. It sufficiently appears that the railroad company had not, and would not have, anything to foreclose upon and sell. The railroad mortgage and property was the primary security for the payment of these railroad bonds, and the object was that that should first be resorted to and exhausted before having recourse to the Jewett trust deed, but that after such exhaustion there might be then immediate recourse to the Jewett trust deed. There being no property to first exhaust, it was the same as an exhaustion of the property. Not a dollar of interest was paid upon the bonds. There was interest due upon them. To foreclose the railroad mortgage would have been a vain and useless thing. The law did not require it. *Lex neminem cogit ad vana seu inutilia.* The case is to be considered the same as if there had been a foreclosure and sale under the railroad mortgage, and a deficiency in the proceeds of sale to the amount of these bonds. Under the above provision, then, in the Jewett trust deed, the bonds were to be taken as due and payable, and there was the present right of foreclosure. It matters not whether Peck *et al.* acquired title by the sale they had caused to be made of the bonds held by them, as, if that sale was invalid, then they still held the bonds as collateral, and their right to foreclose was equal, whether they held the bonds only as collateral, or by absolute title.

The decree in favor of Peck *et al.*, in the Peck suit, was correct. The preference of their first hundred bonds was

given by the trust deed. The charge of fraud in the preference was allegation without proof. The Prescott mortgage upon the Prescott tract was the first of all the liens upon the property, being a purchase money mortgage, given upon the purchase of that tract. The portion of that mortgage which Peck *et al.* paid off, they were obliged to pay in protection of their subsequently acquired interest in the land, and their subrogation to the rights under that mortgage, to the extent of what they paid in its discharge, was clearly right.

2. *Badger* was the holder of the second hundred of the first two hundred bonds which were preferred in the Jewett trust deed, and he assigns for error the disallowance of this preference of these one hundred bonds held by him. Upon the part of the other creditors of Riverside, it is alleged that this preference was fraudulently inserted in the Jewett trust deed, and that the same should be set aside. These bonds were agreed to be taken by Badger in lieu of one hundred and nineteen bonds secured by trust deed to Gallup & Peabody, which he held as collateral to secure his Riverside claim, amounting to something more than $70,000, and which bonds he had pledged to the Third National Bank to secure his indebtedness there. These Gallup & Peabody bonds were secured by a trust deed of a portion of the property, to Gallup and Peabody, which was one of the earlier liens upon the property, and anterior to the Greenebaum trust deed securing the Greenebaum bonds. There is less evidence of the other creditors actually knowing of this preference of two hundred bonds, than of their knowledge of the preference of one hundred in favor of Peck *et al.* Indeed, the other creditors, so far as examined, appear to testify that they did not know of the preference of two hundred bonds. There was quite a time occupied in arrangement of the settlement with creditors for exchange of their securities for Jewett bonds, and in the preparing of the Jewett trust deed. The first draft of it appears to have been in pencil, made in the early winter of 1872–3,

and the trust deed was not completed until June, 1873. It appears that, as first drawn, the number of bonds to be preferred was left blank, and the figure "2" in the trust deed appears to be written over an erasure. It may well be that the preference first contemplated was only of one hundred bonds, and it was afterward concluded to make it of two hundred. However the proof may fail in showing actual knowledge by other creditors, we see no room for the imputation of any fraud in inserting the preference. Childs was the president of the Chicago and Great Western Railroad Land Company, which made the trust deed, and was acting in its behalf. The proof distinctly shows that this preference of two hundred bonds was known by Childs, Badger, and Jewett the trustee, before the execution of the trust deed,—that Badger and the bank refused to surrender up the one hundred and nineteen Gallup & Peabody bonds unless they got the one hundred preferred bonds. Mr. Jewett testifies that he sent the trust deed to the recorder's office to be recorded, "and I knew its provisions in respect to preferences of these first two hundred bonds as they now stand." And, at any rate, if Badger is not allowed these preferred bonds, he should have back the one hundred and nineteen Gallup & Peabody bonds, as they were given up only upon the express agreed condition that he should have for them these preferred bonds. Manifestly he is entitled to have one or the other. It would be more favorable for the other creditors that he should have the preferred bonds, than for him to have the Gallup & Peabody bonds, secured by an earlier trust deed. The trust deed plainly gives the preference of two hundred bonds, and we think the holder of the second hundred bonds is entitled to the preference, as written in the trust deed.

3. *Page & Kimbark bill, and Hukill et al. cross-bill.*—In August, 1870, the Riverside Improvement Company executed six series of bonds, each twenty-five in number, the bonds being each for $1000, payable three years after date, and each

series of bonds was secured by a trust deed executed by the Riverside Improvement Company to Page & Kimbark, which trust deeds were duly recorded. Hukill *et al.* became the purchasers of all these bonds except thirty-five. Release deeds, purporting to release each one of these trust deeds, and purporting to be executed by Page & Kimbark, were filed for record on March 15, 1872, and duly recorded. The evidence shows that the release deeds were executed by Page & Kimbark, and delivered to Seelye *in escrow,* not to be delivered or recorded unless certain arrangements were made, which would have protected the interest of the Page & Kimbark bondholders. By some means, the release deeds were, wrongly, placed on record, without any arrangement having been made to protect the interest of such bondholders. In the course of the preparation for the making of the Jewett deed of trust, it was discovered that the aforesaid releases had been placed upon record, and in rectification of that error, and as security for the protection of the Page & Kimbark bondholders and the guarantor of their bonds, the Riverside Improvement Company made an absolute conveyance to Austin Stevens of the equivalent of one hundred and twenty-two whole Riverside lots, some forty of which were identical with those included in said Page & Kimbark deeds of trust. These Stevens lots were not put in the Jewett deed of trust. Hukill *et al.* obtained judgments against the Riverside Improvement Company, on their claims against the company, April 8, 1874. The Page & Kimbark bill was filed September 12, 1873, by Page & Kimbark, the trustees in the Page & Kimbark trust deeds, for the reinstatement of the six trust deeds made to them, and the cancellation of the releases, and if this could not be done, by reason of superior rights of others, that the Stevens lots be subjected to payment of the Page & Kimbark bonds. The Hukill *et al.* cross-bill was filed January 31, 1876, for the reinstatement and foreclosure of the four Page & Kimbark trust deeds which secured the portion of the Page

& Kimbark bonds which they held, and if they should be found. to be released, then that they might have a money decree against Page & Kimbark, and that the Stevens lots might be subjected to the payment of their bonds.

The bonds secured by these trust deeds had not been paid. The releases were executed and placed on record without the assent or knowledge of the bondholders. The releases were placed upon record without the assent or knowledge of the trustees who had executed them, and in violation of the conditions upon which they had been placed in Seelye's hands *in escrow,* and only upon the performance of which were the releases to be delivered and have effect. The decree establishing the four trust deeds securing the bonds held by Hukill *et al.,* and holding the releases inoperative, was, we think, so far as it went, clearly right. (*Barbour* v. *Scottish-American Mortgage Co.* 102 Ill. 121; *Stanley* v. *Valentine,* 79 id. 344.) It is very true that those subsequently acquiring interests in the property were liable to be misled, and take the premises to be unincumbered by these trust deeds, from these releases appearing upon record; but we do not see that it was in any way from the fault of the bondholders, or that there has been any conduct of theirs which should visit them with the loss of their security.

It is claimed there was *laches* on their part in not proceeding sooner to enforce the lien of the trust deeds. It is said that Hukill learned of the releases of the trust deeds in August, 1873, and did not file his cross-bill in one case until January 20, 1875, and in another until January 31, 1876. But Page & Kimbark, the trustees, did file a bill, "for all persons interested, as well as themselves," to set aside the releases, September 12, 1873,—within one month from the time the recording of the releases came to the knowledge of the bondholders. We think this sufficiently meets the imputation of *laches.*

It is said that Hukill *et al.* affirmed the validity of the releases by bringing suit against the trustees, Page & Kimbark, in the fall of 1873.    We think this should be regarded as no more than the pursuit of a cumulative remedy, and that it was not a waiver of the right to insist upon the invalidity of the releases.    We see nothing prejudicial in the refusal of these bondholders to accept the alleged offer made by Childs, in 1873, to restore to them all the lots which they originally had, as security for their bonds.    These lots had then been conveyed by the Jewett trust deed, and no certainty appears that they could have got released therefrom, so as to make the security as good as it was originally, under the trust deeds to Page & Kimbark.

It is insisted the court erred in not decreeing that the Stevens lots should be exhausted by Hukill *et al.* before the lots in the Jewett trust deed should be resorted to.    The decree, in the respect of sale of lots in the Page & Kimbark trust deed, was, that in case there was not realized from the sale of those lots enough to pay the bonds of Hukill *et al.*, then enough of the Stevens lots should be sold for such purpose, the deed of which, as against their respective judgments, was held fraudulent, and the lien of said judgments was established against said lots.    If the decree was right in giving Hukill *et al.* any recourse at all to the Stevens lots in satisfaction of their claims, then we think the objection is well taken,—that instead of directing the Stevens lots to be taken last, they should have been required to be first exhausted. That would manifestly be so as to those of the Stevens lots which were included in the Page & Kimbark trust deeds. The Stevens lots not being in the Jewett trust deed, they should have first been exhausted by Hukill *et al.*, under the rule that where a creditor has a lien upon two funds, in one of which another party has an interest and not in the other, that party has a right to compel the creditor first to exhaust

the security in which such party has no interest. *Wise* v. *Shepherd*, 13 Ill. 41; *Hurd* v. *Eaton*, 28 id. 122.

Hukill *et al.* were the holders of the bonds secured by four of the Page & Kimbark trust deeds. There were outstanding thirty-five bonds, secured by the other two of the six Page & Kimbark trust deeds. The decree on the Page & Kimbark bill set aside and cancelled the remaining two Page & Kimbark trust deeds, and enjoined the setting up or claim of any rights under them, declaring the bonds which they were given to secure, not to be valid and subsisting obligations. In this there was error. There appears no cause for any discrimination between the six deeds of trust, with respect to the releases or to validity. If any one was sustained, all should have been. In regard to the releases and validity, the decree should have been the same with respect to all of these Page & Kimbark trust deeds and bonds.

4. *Gookins' cross-bill.*—The case of Gookins stands out in distinction from that of all others who exchanged prior securities for railroad bonds secured by the Jewett deed of trust, in that he never took railroad bonds, and has a writing from Mr. Jewett stating the precise condition upon which, only, his securities were to be exchanged. Upon the placing by Mr. Gookins of his securities in Mr. Jewett's hands, the latter gave the following receipt:

"Received, Chicago, May 23, 1873, of Hon. S. B. Gookins, two notes of the Riverside Improvement Company, for $5000 each, dated May 15, 1872; also, fourteen bonds, of $1000 each, of the Riverside Water and Gas Works Company, dated July 1, 1871, and numbered from 201 to 214, both inclusive, which notes and bonds are to be held and disposed of by me, as stated in his letter to me of this date.

JNO. N. JEWETT."

The letter from Gookins to Mr. Jewett, of that date, says, "I place herewith in your hands, to be held in trust for me,"

the securities, describing them, and authorizing Jewett to deliver them to the makers, and cancel them upon the execution of the railroad and Jewett deeds of trust, and the delivery to Jewett, for Gookins, of eleven railroad bonds, secured by said trust deeds, "such bonds to come within the class first to be paid out of all or any of the assets or property covered by each of the two before mentioned deeds of trust, saving and excepting only, as prior thereto, a debt or claim known as the Sapieha claim, otherwise known as the Peck claim, amounting to about $75,000, the priority of which, and of which only, is conceded." The bonds which were offered to Mr. Gookins do not meet the requirement of his letter. Instead of being bonds within the class first to be paid after the Peck claim, they are in the class second to be paid after the Peck claim. The first hundred bonds to be paid under the Jewett trust deed are the Peck bonds; the second hundred are the Badger bonds, and then come the remaining bonds, among which are the bonds for Mr. Gookins. There is a preference of two hundred, instead of one hundred bonds only, as there was to be according to Mr. Gookins agreement of exchange. Gookins' fourteen Riverside bonds were secured by the Greenebaum trust deed. That trust deed was released by Greenebaum at the time of the clearance, so-called, in June, 1873, when the Jewett trust deed was recorded. In September or October next after, the secretary of the Great Western Railroad Company offered to Gookins eleven railroad bonds, secured by the Jewett deed of trust, but Gookins refused to receive them, and has so refused ever since. The notes and Greenebaum bonds placed by Gookins in Mr. Jewett's hands were not surrendered up by the latter, or cancelled by him, and have ever since remained in his hands.

The reinstatement of the Greenebaum trust deed as to Gookins' fourteen Greenebaum bonds, and its foreclosure as to those bonds, is assigned for error. Greenebaum had no power to make the release he did of the trust deed to him,

except upon the surrender and cancellation of the bonds held by Gookins. They were placed in Mr. Jewett's hands *in escrow,* to be surrendered and cancelled only upon the performance of a certain condition. That condition was never complied with. The bonds offered were not such bonds as Gookins had agreed to receive, and as the condition of his deposit required. It is said that Mr. Jewett was the agent of Gookins, and that the latter should be bound by the acts of the former, as his agent. The depositary of an *escrow* is a special and not a general agent, and the person dealing with him is bound to know the extent of his powers. (*Smith* v. *South Royalton Bank,* 32 Vt. 350.) It is the settled doctrine that the delivery of an *escrow* by the depositary to the grantee named therein, without a compliance with the conditions, is not a delivery with the assent of the grantor, and conveys no title, and that the authority of the depositary of an *escrow* is limited strictly to the conditions of the deposit, a compliance with which alone justifies the delivery. *Stanley* v. *Valentine,* 79 Ill. 544; *Evarts* v. *Agnes,* 4 Wis. 343; *Ogden* v. *Ogden,* 4 Ohio St. 182; *Smith* v. *South Royalton Bank, supra.*

It is insisted that as Gookins took no steps to set aside the release of the Greenebaum trust deed until the filing of his cross-bill, February 18, 1876, there were such *laches* and acquiescence on his part as should be a bar to his relief. There was no act of acquiescence on Gookins' part, but the direct contrary. When the bonds were first offered to him, in September or October, 1873, he refused them. When offered again, in March, 1874, he refused them, and made a demand of Jewett of the securities he had placed in his hands. On April 8, 1874, he obtained a judgment, in the Superior Court of Cook county, for $11,900 on the two $5000 notes he had placed in Jewett's hands, to which the Greenebaum bonds were collateral. His interest in the Greenebaum trust deed was, comparatively, very small, he holding only fourteen of the sixteen hundred bonds, and he would hardly be expected to take

the steps to set aside the release which he might have done had he been the sole beneficiary under the security. Whatever acquiring of rights or change of situation there may have been on the faith of the release of the Greenebaum trust deeds, was upon the settlement for the exchange of securities. The bonds under the Jewett trust were not and could not be sold upon the market. A few of them were used, in avail of the privilege under the trust deed, in the purchase of lots. Some were used by way of collateral security, or otherwise used in respect of debts, for which, probably, nothing else could be got. But so far as appears, it was only to a very limited extent that there was any dealing in the bonds. We can not say that under the circumstances the taking of no steps by Gookins to set aside the release until by the filing of his cross-bill, February 8, 1876, was such *laches* as should debar the relief sought. We find no error in the decree of relief to Gookins and his assignee, Newton.

5. *The case of Gregory and Shaw.*—Gregory was, at the time of the transaction resulting in the Jewett trust deed, a creditor of the Riverside Improvement Company for $37,500, holding a judgment against the company, recovered December 18, 1872, for $13,091.21, part of the indebtedness, and notes for the balance, and held fifty-three Greenebaum bonds to secure such debt. This judgment was assigned to Shaw, March 20, 1875. The circuit court decreed that this judgment be cancelled, and this is assigned for error.

The written instruction under which Gregory placed his securities in the hands of Mr. Jewett was, to deliver them to Childs upon receiving the latter's note "and sixty-five of the said mortgage bonds of the Chicago and Great Western Railroad Company, secured by first mortgage on the Riverside property, as indicated in the agreements and schedules exhibited in this matter, and referred to in the proposed arrangement concerning the Great Western railroad and the Riverside property. I am to receive said new bonds and ten

thousand in the stock of the railroad construction company, and when received, and said bonds are secured as proposed, I am to yield up all the Riverside notes and gas and water bonds." Gregory was present at the time the transaction of the settlement was closed, in June, 1873, and received, himself, sixty-five bonds secured by the Jewett trust deed. He says he was hurriedly called into the office of Badger, where the general exchange was made, and took his bonds without examining the trust deed, or knowing there were any preferences in it, and supposing that his bonds were a first lien. According to his instructions above, the bonds he was to have were to be by first mortgage, "as indicated in the agreements and schedules exhibited in this matter," and referred to in the proposed arrangement concerning the Great Western railroad and the Riverside property. These references provide for a first mortgage to secure $1,000,000 of $8,000,000 of bonds. His bonds do come within that class of first mortgage bonds; but if he did suppose there was to be no preference over the bonds he was to have, and did not know of the preference in the Jewett trust deed, he should have known it. It was a general composition by a large number of creditors which was being made, where there was mutuality of action, the action of each depending upon that of another. Gregory's surrender of his securities, and taking new bonds, must be supposed to have influenced others in doing the same. By the concurring action of all in surrendering up their claims and releasing the common security for their payment, new bonds were accepted in lieu of the old, and a new security taken on the released property. For any one to repudiate the arrangement, and return to the old security he had released, would be a wrong and injustice towards the others, and should not be permitted because of carelessness and inattention in not learning of a provision in the trust deed, which, at the time, was open to observation and easy of ascertainment by examination of the trust deed, which was present. Gregory took

his bonds under the Jewett trust deed and retained them, and never expressed any dissatisfaction with the exchange until after the commencement of this litigation. He made use of the bonds by depositing them as collaterals for a loan in one of the Boston banks. He had agreed to release the judgment upon acceptance of the bonds, and gave a written order to his attorney to release the same. He allowed that order to remain in Childs' hands. Gregory informed his attorney that he had made settlement of the judgment, and about a year after the giving of the order, and after this litigation had commenced, Childs came to the attorney with the order from Gregory to release the judgment, but the attorney having been retained by Page & Kimbark, and affairs being mixed, as he says, refused to release the judgment. He says he never knew anything about Gregory's holding bonds till after that. Afterwards, another application was made to the attorney to release the judgment, and he still refused. After that he met Gregory, and the latter revoked the order in May or June, 1874. We are of opinion that the conduct of Gregory amounted to an acquiescence in the transactions of June, 1873, and that he is estopped from repudiating his action in taking his bonds in satisfaction of the judgment, and that the court properly directed it to be set aside. As to the alleged error in taking away from Shaw, under his judgment against the Riverside Improvement Company, of August 5, 1874, for $41,907.32, the security of the Stevens lots in favor of Gage, that will be remarked upon in connection with the latter's case.

6. *The Gage bill.*—With respect to Gage, the decree found that he received four hundred of the bonds under the Jewett trust deed in part settlement of his claim, and had made use of the same, and was estopped to deny the validity of that trust deed, or of the releases made by Greenebaum as to all the lands covered by that trust deed. But the decree further found that the release of the Greenebaum trust deeds as to

the lots and lands contained in the Stevens deed was procured by fraud, and was void as against Gage, and that he still had a lien on the lots and land in the Stevens deed for the money found due him, and as to a few of those lots it finds a vendor's lien in favor of Gage. The property conveyed to Stevens was in the Greenebaum trust deed, but not in the Jewett trust deed, as has been observed, it having been conveyed to Stevens, as we have found, in protection of the Kimbark trust deeds which had been unauthorizedly released.

The finding of a vendor's lien as to any of the lots was manifestly erroneous. Gage made a deed of his land to the Riverside Improvement Company, and as security for the unpaid part of the purchase money accepted seven hundred and fifty-nine Greenebaum bonds. These bonds were secured by the Greenebaum trust deed, which was on not only the Gage land, but also on the Prescott tract, thus giving to Gage a distinct and independent security for his purchase money. It is well settled by decisions in this State, that by thus taking a distinct and independent security for the remaining purchase money, Gage waived all right to a vendor's lien. *Conover* v. *Warren,* 1 Gilm. 498; *Trustees of Schools* v. *Wright,* 11 Ill. 603; *Boynton* v. *Champlin,* 42 id. 57; *Cowl* v. *Varnum,* 37 id. 181; *Warner* v. *Scott,* 63 id. 368. The fraud alleged, upon which it was found the release of the Greenebaum trust deeds as to the property in the Stevens deed was procured, consisted in the alleged representation, made by Childs to Gage, that all the Riverside property should be put into the Jewett trust deed. No greater effect could be claimed from such a fraud than that the alleged false representation should be made good, and the property in the Stevens deed be put into and made subject to the Jewett trust deed, which would allow all the holders under that trust deed to participate in the property. We see no reason for the appropriation of that property to the exclusive benefit of Gage. In order to enable Gage to have benefit of this property conveyed to Stevens

which was not in the Jewett trust deed, he was reinstated in his position of a holder of bonds under the Greenebaum trust deed, and allowed a foreclosure upon property not covered by the Jewett trust deed, viz., that in the Stevens deed, which bonds he had before surrendered up in exchange for Jewett bonds, and had given consent to the release of the Greenebaum trust deeds. If there was to be a going back to Greenebaum bonds which had been given up, it should have been permitted to all who had exchanged Greenebaum bonds for Jewett bonds. If there was to be distinction in that respect, among all the creditors we view Gage as the last one in whose favor such a discrimination should be made. As much the largest creditor, being the holder of about one-half of the $1,600,000 Greenebaum bonds, he was more deeply interested than any other, except, perhaps, Childs, in the scheme which resulted in the giving of the Jewett trust deed. It was expected it would render the new bonds marketable, whereby Gage would be paid off. If not an inventor, he was an active promoter of the project. Together with Childs, he, for some six months of time, was actively engaged in planning, managing and accomplishing the result of the Jewett trust deed. He and Childs were the chief actors in bringing it about. If any one of the creditors ought to have known, and should be taken to have known, what were the provisions of the trust deed, it was Gage himself. We think he should stand on the same footing with the other holders of Jewett bonds, in all respects. His subrogation to the Prescott mortgage for the amount he contributed to its discharge, was right, as we have found it to have been in the case of Peck *et al.* It results that it was erroneous, as complained by Shaw, to take away from him, as a judgment creditor, the security of the Stevens property, as was done, in favor of Gage. It is said that Shaw did not file a cross-bill seeking any affirmative relief in regard to this matter; but he sets up the judgment in his answer, its date and amount, and that execution upon it was duly

sued out, and returned unsatisfied. This was sufficient, as we conceive, in the way of pleading, to insure the protection of the rights of Shaw as a judgment creditor, without the filing of a cross-bill. *Armstrong* v. *Warrington*, 111 Ill. 430.

7. *Joshua C. Sanders* sought avail of the privilege given by the Jewett trust deed, of the conversion of bonds into lots at the schedule prices fixed. He, in January, 1874, purchased of the Chicago and Great Western Railroad Land Company, and received deeds of the equity of redemption (subject to the Jewett trust deed) to three hundred lots. He afterwards made a tender to the trustee of bonds to the amount of the schedule prices of his lots, and demanded a release of his lots, which was refused. The circuit court, in its decree, found that the deeds to Sanders were obtained by fraud, and set them aside. There are no allegations or prayer in the pleadings upon which the court could set aside the deeds to Sanders. The consideration which he gave for the making of the deeds was about $25,000, notes of the Riverside Improvement Company, which the land company had assumed, and which he held, and his conveyance of $4000 worth of Flushing lots. The sale and deeds to Sanders were approved by a resolution of the board of directors of the Great Western Railroad Land Company, at a meeting held on January 17, 1874. But the deed of the equity of redemption might have been without any consideration to a holder of bonds, and he be entitled to a release. Nothing in addition to the schedule price was required to be paid. The provision of the trust deed was express, that upon receiving the schedule price of any lot, in bonds, the trustee should release the lot from the trust deed. We find no sufficient evidence that the deeds to Sanders were obtained by fraud, and as the holder of bonds to the amount of the schedule prices of his lots, which he tendered, by the plain terms of the deed of trust he would seem to be entitled to the release which he demanded.

Question is made as to Sanders being a *bona fide* holder of the bonds. It appears that Duncomb sold and delivered to Sanders one hundred and ninety-five bonds, for which Sanders paid $20,000, and Duncomb delivered to Sanders twenty bonds, and gave him an order on Jewett for one hundred and twenty bonds, upon which Sanders obtained from Jewett one hundred and sixteen bonds. Subsequently, Duncomb obtained from other holders of bonds, and delivered to Sanders, other bonds, making in the aggregate the one hundred and ninety-five bonds. It is claimed the one hundred and sixteen bonds were not properly issued. They were obtained under the following circumstances: Gage originally received, at the time of the Jewett clearance, as it is called, two hundred and fifty bonds, the settlement of the balance of Gage's claim being reserved for future adjustment. These two hundred and fifty bonds remained in Mr. Jewett's hands, for Gage. Subsequently, about November or December, 1873, Mr. Jewett holding two hundred and seventy other bonds still undisposed of to creditors, and Gage being under the necessity of raising a large amount of money, Childs, representing the Riverside companies, says that he was urged, on behalf of Gage, to let the latter also have these two hundred and seventy bonds; that he (Childs) urged that one-half of them (one hundred and thirty-five bonds) should be given to Duncomb, who was a creditor of Riverside for some $200,000, and resided in New York, being the only large creditor who had not been then provided for, and to whom two hundred bonds had been promised,—one hundred out of the first thousand bonds, and one hundred of the amount above that,—but that finally Childs consented that Gage should have the whole two hundred and seventy bonds, making five hundred and twenty in all, and that Jewett, with the consent of Gage and Childs, delivered the five hundred and twenty bonds to Hurlbut, to raise money for Gage's benefit. Subsequently, the attempt to raise the necessary money for Gage on these bonds failing,

four hundred and seventy of these bonds were returned by Hurlbut to Jewett, Hurlbut retaining fifty for his services and trouble. Of these four hundred and seventy bonds, Childs says Gage consented to be satisfied with three hundred and fifty, making, with the fifty retained by Hurlbut, four hundred received by Gage, and that Duncomb should have one hundred and twenty upon his claim, and Gage gave an order authorizing Jewett to deliver them to the order of Duncomb. Gage and Jewett do not agree with Childs that five hundred and twenty was agreed upon as the number of bonds Gage should finally have, but say that such amount was four hundred; nor do they agree with Childs in his statement that they consented that Duncomb should have one hundred and twenty bonds upon his claim; but Mr. Jewett does admit that the five hundred and twenty bonds were delivered by him to Hurlbut, upon which to raise $100,000 for the benefit of Gage, and that he would not deliver the one hundred and sixteen bonds to Sanders which he did deliver, upon the order of Duncomb and Stevens, but required the further order of Gage, which was given. Gage testifies that in the course of the preparation for the June settlement, Childs gave him a schedule of debts owing by the Riverside Improvement Company, and they considered the prospect of getting them up with the bonds to be issued; that the schedule contained the names of parties with whom it was fair and necessary to settle, and the debts due them, approximately; that Duncomb appeared on the schedule a creditor for $190,000. We think the evidence shows an indebtedness to Duncomb, at least to an amount exceeding the one hundred and sixteen bonds; that this indebtedness was contemplated and considered with the rest in the making of the arrangement for the adjustment of outstanding indebtedness with the new bonds; that in the distribution of the bonds, Duncomb was neglected and left unprovided for, as was Gage, in part, although, as Childs says, there had been two hundred bonds promised Duncomb.

The balance of Gage's claim was reserved for future adjustment. On January 12, 1874, the directors of the Chicago and Great Western Railroad Land Company passed this resolution: "Whereas, the claim of David A. Gage against the Riverside Improvement Company, which amount was assumed to be settled by this company, is yet unsettled, it is therefore resolved that all the bonds that are not in other hands as collateral, belonging to the company, (the same being two hundred and seventy in number,) be paid to David A. Gage," etc. These bonds were in the hands of Mr. Jewett, undisposed of to creditors. They made, with the two hundred and fifty originally given to Gage, five hundred and twenty bonds in all allowed to Gage. On February 23, 1874, Jewett, by direction of Childs, president of the land company, and upon the written order of Gage, delivered the one hundred and sixteen bonds to Sanders, under the order of Duncomb. Childs, at the time of his direction, said the bonds were to pay the debt the improvement company owed Duncomb. The form of Gage's order to Jewett was, "to deliver one hundred and twenty of the five hundred and twenty bonds of the Chicago and Great Western Railroad Company, now in your hands, to the order of D. S. Duncomb." We do not find, from the evidence, that these one hundred and sixteen bonds were improperly issued.

As to all the rest of the one hundred and ninety-five Sanders bonds over the said one hundred and sixteen, there is no pretence, by the evidence, that they were not properly issued. The whole number of bonds were issued and distributed at the time of the June settlement, except the two hundred and seventy left in Mr. Jewett's hands, and the latter were disposed of as above named, completing the issue of all the bonds. It is said that it is not shown how Duncomb came by the remainder of the bonds. This was not necessary. The bonds were payable to bearer, and out in circulation, to pass from hand to hand. It was not incumbent upon the

holder of any of the bonds asking the benefit of them, to account how himself or any previous holder of the bonds obtained them. They would be presumed to be rightful holders until the contrary was shown. The right of conversion of the bonds into lots was an important incident of the bonds, and gave to them an additional value. It was a right which was attached to the bonds, and was equally enforceable with that for the money which the bonds called for. The total value of the lands covered by the Jewett trust deed securing $1,000,000, as fixed by the schedule of prices, was $1,800,-000. The taking of lots by the holders of bonds, at the schedule price, for their bonds, was of advantage to the company in disposing of their lots at the company's prices. It reduced the bonded indebtedness more rapidly than the security, and thus increased the security of the other bondholders, except the preferred ones, the bondholders who got lots getting less than their share of the security. The preferred bondholders have no cause of complaint in the exchange of bonds for lots, as their preference was under this condition. It was a provision for the benefit of the unpreferred bondholders, in that it enabled them to obtain a share of the security, and therein was in promotion of equality, which is equity, and so to be favored. Before making the deeds to Sanders, the president of the land company offered to the Pecks, to Gage, and to nearly all the large bondholders, to convey lots, at the schedule prices, in exchange for bonds, which they refused, preferring their bonds rather than to turn them into real estate. We are of opinion the relief asked by Sanders should have been granted to him upon the surrender of his bonds.

8. *Horace A. Hurlbut* had obtained from the land company a deed of the equity of redemption to thirty-five lots, and tendered bonds to the amount of their schedule prices to the trustee, and demanded a release of his lots from the trustee, which was refused. Hurlbut's bonds were the fifty which we have before spoken of as retained by him out of

the five hundred and twenty Gage bonds which were placed in his hands to raise money for Gage's benefit, and afterward, upon failure to raise the money, returned, except fifty, which he retained, claiming his right to do so, for the services he had rendered. It is a matter of dispute between Gage and Hurlbut whether the latter is entitled to anything for such services, Hurlbut claiming that he is, and Gage denying it, and insisting that Hurlbut's retention of the bonds is wrongful. The title to the bonds should be settled by a suit at law between Gage and Hurlbut. The proof showing such uncertainty as to Hurlbut's title to the bonds which he tendered, we think the trustee was justified in not receiving them, and not executing to Hurlbut a release of the lots, and we find no cause for disturbing the decree denying relief to Hurlbut.

9. *Charles M. Smith* held the conveyance of the land company of the equity of redemption to sixteen lots, and having made a tender of eight bonds, amounting to the schedule value of his lots, and requested a release of these lots, which was refused, the circuit court, on his cross-bill, decreed him entitled to a release of his eight lots from the lien of the Jewett trust deed. The court, however, decreed that these lots should be sold (in sale of five-eighths of the Prescott tract, in which they are included,) on foreclosure of the Greenebaum trust deed on the Gookins cross-bill, and this is assigned for error by Smith. We perceive no error in this. The lots were included in the Greenebaum trust deed, which was a prior incumbrance to the Jewett trust deed, and the release of the lots from the latter left them subject to the lien of the Greenebaum trust deed, which, as to Gookins, we have found was not released, and that it was released as to Smith, and the others taking the new bonds in exchange for their Greenebaum bonds.

We find no error in the decree refusing the relief asked by Smith, of having released from the Jewett trust deed lots 636, 637 and 638, the equity of redemption to which he held

a conveyance of, from the land company, and he had brought into court and offered to surrender bonds in redemption. Upon these lots, or two of them, the Riverside gas works are situated, which cost $40,000 or $50,000, and are now in operation. They were not included in the schedule made under the Jewett trust deed, and were not intended to be. Smith had no right to have a release of these lots from the Jewett trust deed by reason of such conveyance of the equity of redemption to them, and denial of such release was properly decreed.

10. *William T. Allen,* who exchanged Greenebaum bonds for new bonds, by his cross-bill prays a reinstatement of the Greenebaum trust deed, and that he may be remitted to his original *status* as holder of Greenebaum bonds. We find nothing in his case to distinguish it from that of the others who made exchange of Greenebaum bonds which they held, for new bonds, and perceive no error in the dismissal of his cross-bill.

As an instance where the rule of sale in the inverse order of alienation was violated, reference is made to the ordering to be sold last the property covered by five certain deeds made by the Great Western Land Company to George Taylor, as trustee for the city of Chicago, in July, 1874, when the sixteen lots conveyed by the land company to Charles M. Smith (which conveyance was sustained) were so conveyed on April 15, 1874. We discover no good reason for ordering the sale of these lots of Smith before the lands subsequently conveyed to the city. It appears to be a departure from the rule generally observed in the case of ordering sale in the inverse order of alienation where there had been conveyances, and it is without explanation to us.

It is claimed the court erred in decreeing the sale *en masse* to satisfy the Gookins claim, of the west one hundred acres of the south-west quarter of section 35, township 39 north, range 12, which had been subdivided into lots and blocks as

the fifth division, and different lots sold to purchasers, among others the sixteen to Charles M. Smith. It is said the sale should have been by lots, according to the subdivision, and the portions unconveyed should have been directed to be first sold before taking these lots. This would have been the proper course if there might have been a sale by lots, and a sale *en masse* could not have been made more advantageously; but we think this would relate to the conduct of the officer in making the sale. We do not understand the decree as requiring that the sale should be *en masse*, and not by lots. Of course the portions unconveyed should have been first sold before taking any lots which had been conveyed.

Complaint is made that there was not a proper marshalling of the securities in respect of the sale of the Stevens lots, and the sale to pay the Gookins claim. In respect to the Stevens lots, we have already remarked as to resorting to them for the satisfaction of the claims of Hukill *et al.* For the same reason as in the case of Hukill *et al.*, in making sale under the Greenebaum trust deed for the satisfaction of the Gookins claim, the remaining unexhausted Stevens lots, if any, should have first been exhausted, the Stevens lots being in the Greenebaum and not in the Jewett trust deed. And under the Shaw judgment of August 5, 1874, for $41,-907.32, any of the Stevens lots remaining unexhausted should first have been resorted to for satisfying that judgment before resort to any other property, if so required by any claimant under the Jewett trust deed. And in the sale under the Jewett trust deed the part unconveyed should first have been sold, and the portions which had been conveyed should have been sold in the inverse order of their alienation.

The defendants in error have suggested a diminution of the record herein, and presented an additional record of proceedings in the cause subsequent to the foreclosure decree, to supply the alleged diminution, which was allowed to be filed, reserving until the hearing the questions arising upon this

suggestion,—whether the record was diminished, and whether this writ of error involves the deficiency decree contained in the additional record. The error alleged as existing in the additional record is the order or decree of the circuit court of July 15, 1881, in the suit of Peck and others ·against the Chicago and Great Western Railroad Land Company and others, directing a substituted report of sale to be filed in place of a prior one alleged to be lost from the files, and entering a personal decree in favor of Peck and others, against said land company, for a deficiency, without notice of application therefor to defendants, and also the order of said court overruling the motion to vacate and set aside such order of July 15, 1881. A writ of error was sued out from the Appellate Court for the First District, to the circuit court, by the Great Western Railroad Land Company and the Third National Bank of Chicago, to reverse the said order or decree, and such order or decree was affirmed by the Appellate Court, from which judgment of affirmance an appeal was taken to this court, and is now pending, being the next case upon the docket, and having been submitted for determination together with the former cause, which we have just been considering. Both records being thus at the same time before us, and they together constituting but the one record in such former cause, we will not split the matter into two causes, but will consider the two records together as forming the record in such former cause, and will therein dispose of the questions made on the additional record as arising in that case.

There was no *supersedeas* under the writ of error upon the foreclosure decree, and the additional record shows a sale had under that decree, and that on August 20, 1879, Mr. Adair, the special commissioner appointed to make sale, filed his report of sale, stating that he had made such sale on June 21, 1879, and struck off and sold the lands directed to be sold, to Clarence I. Peck, one of the complainants, and he reported a deficiency to pay the complainants, Peck *et· al.*,

of $20,468.67; and on the same day an *ex parte* order was made confirming the report, unless excepted to within thirty days.   Nearly two years afterwards, on July 15, 1881, the complainants, Peck and others, upon *ex parte* affidavit that the original report of sale was not to be found upon the files, procured the entry of an order that a substituted report, then presented by the special commissioner who made the sale, be filed in lieu of said original report *nunc pro tunc,* as of the date of filing the original report, August 20, 1879, and granting to the said complainants a decree for deficiency against the Great Western Railroad Land Company for $21,685.09, and awarding execution therefor.   This order or decree was entered without notice to the land company, against whom it was rendered, or to any other defendant.   The substituted report of sale stated that the sale took place on *July* 21, 1879, while the original report, which was confirmed, states that it took place *June* 21, 1879.   On July 16, 1881, the day following the entry of said decree, a motion was made by said land company, and the Third National Bank of Chicago, and Charles A. Phillip, who are holders of bonds secured by the Jewett trust deed, to set aside such order or decree.   During the hearing of said motion the complainants made two cross-motions,—one to amend the deficiency decree so as to show that William D. Kerfoot, receiver of said land company, (appointed in the suit of Badger against said land company and others,) had notice of the application for said deficiency decree, and appeared in court by counsel when the same was entered.   The other cross-motion was to remit $2797.06 from the amount of such deficiency decree.   On January 5, 1883, the circuit court overruled said motion to vacate said order or decree, and granted complainants' cross-motions to amend said decree and to remit, and ordered that such decree be amended *nunc pro tunc,* as of July 15, 1881, so as to show that the receiver, Kerfoot, appeared by his solicitor when the said decree was entered, and further ordered that the amount

of the *remittitur* be indorsed by the sheriff on the execution issued under said decree.

It is insisted that portion of the order of July 15, 1881, which directed the substituted report of sale to be filed in lieu of the original report, should not have been made, unless upon notice to parties adversely interested,—referring to *Harris* v. *Lester,* 80 Ill. 314, where this court said: "The power of the court to replace that which has been lost or destroyed from the files, for any cause, can not be invoked, except upon reasonable notice to parties adversely interested." · Also, that the decree for deficiency in favor of complainants, Peck *et al.,* should not have been entered without like notice, and *Mulvey* v. *Carpenter,* 78 Ill. 580, is cited, which holds that such a decree for deficiency, entered after the term at which the master's report of sale was filed and confirmed, without notice to the defendant against whom it was entered, was null and void for want of jurisdiction. The original decree of foreclosure provided that if the moneys derived from sale upon the Peck bill should be insufficient for their payment, the commissioner making the sale should specify the deficiency, and a personal decree should be entered against the Great Western Land Company for the deficiency and interest, and there should be execution therefor. As before stated, the commissioner's report of sale, specifying the deficiency, was filed August 20, 1879, and on the same day an order was made confirming the report, unless excepted to within thirty days. Nearly two years afterwards, on July 15, 1881, the deficiency decree was entered. We think, under the authorities above cited, there should have been notice given of the application for the deficiency decree, it having been made at so long a time subsequent to the coming in and confirmation of the report of sale ; and the question presented is, whether the recital in the deficiency decree, of the appearance of the receiver of the Great Western Railroad Land Company at

the time the decree was entered, sufficiently shows compliance with the requirement of notice.

Appellants' counsel takes the view of this deficiency decree as one entered in an original suit against the land company, and as the decree is not against the receiver, but a personal one against the land company, maintains that the appointment of a receiver of a corporation does not affect its capability of being sued, and that jurisdiction of the debtor, the land company, could be obtained only by service of process or notice upon the debtor, and not upon the receiver of its property, or any other person. We are of opinion the matter is to be viewed somewhat differently. In the case of an original suit, the notice to be given would be prescribed by law, and conformity thereto would have been required. But the entering of this deficiency decree was a proceeding in a suit which had been regularly instituted,—one in the execution of a decree which had been rendered therein,—and although it is required that there should be notice, the mode of notice is not prescribed by law. In 1874 a bill was filed by Badger, against the Great Western Railroad Land Company, Childs, its president, and Murray, its secretary and treasurer, upon which, July 22, 1874, a receiver of the land company was appointed, and Murray and Childs enjoined from interfering with the affairs of the company or the title of the property. The order appointing the receiver conferred upon him powers, among others, to take charge of the property, and collect the debts or claims; to compound for any of its debts, in his discretion, with power to prosecute and defend, in the name of the company or his own name as receiver, all such suits as he should deem expedient; to sell, for cash or on credit, at public or private sale, all real or personal estate, subject to the approval of the court; to submit to arbitration any dispute or controversy in regard to any debt due the company; to employ all such attorneys and counsel as he should deem necessary and expedient in the management, protection

or disposal of the property, etc.; that Childs and Murray should turn over to him all the estate, books, records, etc., of the company. It thus appears there was given to the receiver power to prosecute and defend suits in the name of the company. He, alone, had power to admit or pass upon claims. He had control of the assets of the corporation which were to be affected by the deficiency decree. As a corporation is not a physical entity, a notice to it can only be to one who is an agent of the corporation. The receiver, by his appointment, became the legal agent of the corporation. If the notice should have been served upon the corporation, the most proper official would be its president, Childs, and next, its secretary, Murray. But they had been removed from power, as being unfit and improper persons, and enjoined from action. In serving the proposed end of the notice,—that of affording an opportunity for protection of the interests of the land company,—the receiver would seem to have been the proper person to whom to give the notice. And we are disposed to recognize the notice to him as sufficient in this case—to say that the land company had notice through its representative, the receiver.

There is nothing substantial in the point which is made with regard to the discrepancy between *June* 21, 1879, and *July* 21, 1879,—the original report of sale, which was confirmed, showing a sale on June 21, and the substituted report a sale on July 21. It appears plainly enough that there was a clerical error in the original report in naming the time of sale as in June instead of July.

We find no error in the aforesaid order or decree of July 15, 1881, and it will be affirmed, and there was no error in the refusal to vacate it. The foreclosure decrees, for the errors which have been indicated, will be reversed, and the cause remanded for further proceedings in conformity with this opinion.

*Decrees reversed.*